**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **STEVEN M. MONACELLI,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:21-cv-2649** |
| **CITY OF DALLAS and OFFICERS** | § | |
| **JOHN DOE 1-4, individually and in** | § | |
| **his official capacity as a Dallas Police** | § | **JURY TRIAL DEMANDED** |
| **Department Police Officer,** | § | |
| | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT

Plaintiff Steven Monacelli files this Complaint for damages and other legal and equitable relief from the City of Dallas, Texas ("the City") and John Doe Police Officers 1-4, in their capacity as Dallas Police Department officers, (together "Defendants") for violating his rights under the U.S. Constitution, including protections against the use of excessive force and unlawful arrest, violations of 42 U.S.C. § 1983, and any other cause(s) of action that can be reasonably inferred from the facts set forth herein.

## INTRODUCTION

1.     This case is about the constitutional rights to freedom of speech, freedom of the press, and freedom from unlawful arrest. In the summer of 2020, protests erupted in major cities across the nation after George Floyd's murder in Minneapolis. Monacelli, and a cameraman, were on assignment for the Dallas Voice covering protests in Dallas. During this coverage, Monacelli used his cell phone to film a large group of protesters that marched from downtown and eventually onto the Margaret Hunt Hill Bridge (the "Bridge")—a demonstration meant to shine a spotlight on abuses of power by police departments across the country and racial inequality. While reporting on the protest, Monacelli was struck in the leg by a kinetic impact projectile ("KIP"). Monacelli

immediately offered proof of his press credentials to the Dallas Police Department ("DPD"). But rather than offering him aid and assistance, DPD officers ignored Monacelli's credentials and arrested and zip-tied Monacelli on the Bridge. DPD kept him in custody and prevented him from covering the event any further.

2.      Monacelli's injuries are the direct result of Defendants' unlawful actions, the official policies of the City, and the failures of the City and its police department to implement and enforce policies and standards that ensure its officers are aware of, and are trained in, the constitutional limits of force against civilians and journalists—particularly those exercising their First Amendment rights to engage in newsgathering activities.

3.      As a result of Defendants' unlawful actions, Monacelli is entitled to injunctive relief to prevent future violations of his rights under the U.S. Constitution, including protection against unreasonable search and seizure under the Fourth Amendment and obstruction of his newsgathering activities protected by the First Amendment, as well as deprivation of his rights under 42 U.S.C. § 1983, and any other cause(s) of action that can be inferred from the facts set forth herein.

4.      KIPs, which include "rubber bullets" and "sponge bullets," are often used by police officers for crowd control purposes. Though sometimes marketed as "less than lethal," this type of ammunition can cause bruising, contusions, lacerations, fractures, nerve damage, internal injuries, and even injuries leading to death. One British study estimates that 3 percent of people struck by KIPs die as a result of their injuries.

5.      Monacelli is a Texas resident and a freelance journalist. He was on the shoulder of the Bridge on June 1, 2020, to cover protests calling for police reform and an end to racial injustice. But against his wishes, Monacelli found himself part of the story as he was subjected to excessive

force in the form of a "less than lethal" rubber or sponge bullet to the back of his leg and a subsequent lengthy and unlawful arrest. These police actions left Monacelli injured and limping, badly bruised, and suffering from heightened anxiety and mental trauma that forced him to seek medical care.

6.      This is a civil action for monetary and injunctive relief for injuries Monacelli sustained as a result of the acts and omissions of Defendants the City of Dallas and John Doe Police Officers 1-4. These Defendants, both individually and collectively, were responsible for the excessive use of force against Monacelli and the resulting physical and mental injuries and constitutional violations of the First, Fourth, and Fourteenth Amendments. These injuries are the direct result of official policies of the City and failures by the City to implement and enforce policies and standards that ensure DPD officers know and are trained in the constitutional limits of force against civilians, particularly those exercising their First Amendment rights.

## JURISDICTION AND VENUE

7.      Monacelli realleges and incorporates by reference the allegations contained in the preceding paragraphs.

8.      Federal jurisdiction over this action is proper in this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.*, as amended, and (iii) 42 U.S.C. §§ 1983 *et seq.*, as amended.

9.      The Court has general personal jurisdiction over Defendants the City of Dallas and John Doe Police Officers 1-4 by virtue of their citizenship and residence in Dallas County, Texas, as well as their continuous and systematic contacts with the State of Texas. Defendant City of Dallas is a municipality incorporated in the State of Texas. Upon information and belief, Defendants John Doe Police Officers 1-4 are residents of the State of Texas and officers for the Dallas Police Department.

10.      The Court also has specific personal jurisdiction over Defendants City of Dallas and John Doe Police Officers 1-4 because Monacelli's claims against them arise out of or relate to contacts between Defendants and the State of Texas. John Doe Police Officers 1-4, acting on orders and policies promulgated by City of Dallas policymakers and police officials, used excessive force against Monacelli during the June 1, 2020, Dallas protest and arrested him in violation of Monacelli's First Amendment rights. Monacelli's claims against these Defendants arise from those actions and Defendants' contacts in the State of Texas.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

12.      Monacelli Steven M. Monacelli is a Texas resident and a journalist. He currently resides in Dallas. Monacelli is editor and publisher of Protean Magazine, an online and print literary magazine he founded in 2018. He has also freelanced for numerous local and national publications including *The Daily Beast, Dallas Observer*, *D Magazine, Eater Dallas*, *Dallas Weekly, Dallas Free Press*, *Fort Worth Weekly, Central Track*, *Byline Times*, and *Frisco Style*.

13.     Defendant the City of Dallas, Texas, is a political subdivision of the State of Texas and operates and controls the Dallas Police Department. Defendant is located in the State of Texas and within the Northern District of Texas, Dallas Division, and can be served with process through City Attorney Christopher J. Caso and Executive Assistant City Attorney Tatia R. Wilson at the Dallas City Attorney's Office, 1500 Marilla St., 7DN, Dallas, TX 75201. Executive Assistant City Attorney Wilson has stated that she will accept service on behalf of the City of Dallas, Texas.

14.     Defendants John Doe Police Officers 1-4 are City of Dallas Police Officers. As Does are named as defendants in their official capacity as DPD police officers, they may be served with process through DPD, 1400 S. Lamar St., Dallas, Texas 75215.

## CONDITIONS PRECEDENT

15.     Monacelli realleges and incorporates by reference the allegations contained in the preceding paragraphs.

16.     All conditions precedent have occurred or have been performed. Fed. R. Civ. P. 9(c).

## STATEMENT OF FACTS

17.     Monacelli is a freelance journalist and a magazine publisher. He has worked in journalism since 2018 after an earlier career as a consultant and has covered events in the Dallas-Fort Worth area for the Dallas Voice and the Dallas Observer among many other publications.

18.     On June 1, 2020, Monacelli went downtown to cover protests that erupted in Dallas, as in other cities across the country, after the murder of George Floyd by a former Minneapolis police officer. Monacelli was on assignment to cover the protests for the Dallas Voice.

19.     The Dallas protests, spanning several days and nights, were largely peaceful. On the night of June 1, protesters marched without incident from the Frank Crowley Courts Building,

up Riverfront Boulevard, before being redirected by police officers onto the Margaret Hunt Hill Bridge (the "Bridge"). This peace was interrupted by police officers in the form of so-called "less lethal" rubber bullets, smoke bombs, and tear gas fired into the demonstrators. Video footage from journalists and protesters alike capture this moment and these extreme actions taken by the officers. The protest started at a rally outside the court building. At around 8:00 p.m., those assembled walked north on Riverfront Boulevard according to press accounts.[1] Upon reaching the base of the Bridge at the intersection of Riverfront Boulevard and Woodall Rogers Freeway, officers blocked the protesters from continuing on that road.[2] However, Dallas Police left the westbound ramp onto the Bridge open and individual officers instructed protesters to "continue moving" in the only direction that was not blocked.[3]

20.     At around 9:00 p.m., protesters walked west across the bridge and Monacelli, along with other journalists, walked ahead of the crowd so he could document the event on his camera phone.

21.     Monacelli was one of several journalists who positioned himself at the periphery of the protest. As protesters entered the narrower confines of the Bridge, Monacelli kept to the shoulder of the road.

22.     After hundreds of protesters marched onto the bridge, a line of Dallas Police officers in riot gear formed and confronted them on the other side while a group of officers

---

[1] Silas Allen, *Kettling Tactic Dallas Police Used Against Protesters is Steeped in Controversy*, DALLAS OBSERVER (June 8, 2020), https://www.dallasobserver.com/news/dallas-police-protesters-kettling-margaret-hunt-hill-bridge-11916828.

[2] Tim Cato, *I was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, D MAGAZINE (June 3, 2020, 3:44 pm), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to-happen/.

[3] *Id.*

hemmed protesters in from behind using armored vehicles in a "kettling" maneuver.[4] Caught between these groups of officers were protesters, of course, but also several journalists, including Monacelli, and a member of the Dallas City Council.[5]

23.    When the protesters approached the line of officers at the west end of the bridge, officers launched several canisters containing chemical irritants in their direction. As a result, protesters and journalists near the front of the crowd were exposed to airborne irritants.

24.    As tear gas began to irritate the lungs and eyes of protesters, many started running away toward the east side of the bridge.

25.    Monacelli was almost immediately exposed to the gas, which forced him to stop filming and flush out his eyes and clear his lungs. Once composed, Monacelli resumed filming the protesters near the front of the march as they beat a hasty retreat in the opposite direction. This left Monacelli and at least one other journalist positioned between the protesters and an advancing line of Dallas police officers

26.    At approximately 9:02 p.m., while Monacelli panned his camera phone back and forth to capture both the retreating protesters and the advancing officers, officers began firing KIPs at the crowd and the journalists on its periphery. Monacelli witnessed a person who was struck with a KIP and he panned down to see what type of ammunition was used.

27.     As Monacelli's back was turned to the officers, John Doe Police Officer 1 fired a KIP at Monacelli's leg, leaving a large, discolored bruise that would leave Monacelli limping for several days.

28.    Monacelli's injury is pictured below.

---

[4] *Id.*
[5] *Id.*



29.     Seconds later, John Doe Police Officer 2 shot Monacelli in the back with a paintball, as Monacelli was staggering away from the officers to tend to his wound. The paintball left a neon green mark on Monacelli's shirt on the small of his back.

30.     Monacelli was not the only person, or even the only journalist, hit by a projectile that night. A *Dallas Morning News* staff photographer, who also found himself positioned between the officers and the protesters, was hit in the upper thigh or buttocks with a projectile.[6]

31.     Though Monacelli was in considerable pain, he intended to complete his freelance assignment that night. However, he would not be able to do so, as officers began arresting people on the bridge, including Monacelli. This is despite the fact that Monacelli was clearly engaged in First Amendment-protected newsgathering activities at the time.

32.     Monacelli wore a white helmet with the word "PRESS" in large black lettering so as to be as conspicuous as possible. He also wrote the word "PRESS" clearly on the straps and back of his backpack and on the front of his shirt. Finally, Monacelli had with him on his phone emails clearly demonstrating that he was currently on assignment and he was ready to show these emails to any law enforcement officials, if any would look.

33.     Rather than verify his credentials, officers forced Monacelli to the ground where he was made to sit for approximately 2 ½ hours.  After about an hour, officers bound Monacelli's hands behind his back with zip ties.

34.     Throughout the arrest, Monacelli told officers he was a journalist and offered to demonstrate this through emails from his editor at the Dallas Voice showing he was on assignment. Numerous officers ignored Monacelli's words, the word "PRESS" displayed conspicuously on his clothing, and the email from his editor.

35.     Officers, however, did let certain journalists from various other outlets continue to report on the events, while Monacelli was forced to continue sitting.

---

[6]     Ryan        Michaelesko        (@photosbylesko),        Twitter        (June        5,        2020), https://twitter.com/photosbylesko/status/1269073413030764544 ("Whatever you want to call it: rubber bullet, foam bullet, less-lethal ammunition. I was hit in the rear with this on the bridge Monday night as I was caught between the police line advancing from the west and protesters. It still hurts to sit.").

36.     Noticing this, Monacelli grew frustrated that officers appeared to be picking and choosing which reporters could do their jobs based on something other than whether journalists were covering the events professionally. As a result, he made every effort to ask why he was still being detained despite carrying proof that he was a working journalist along with contact information of his editor for any officers who would independently verify his credentials.

37.     John Doe Police Officer 3 (pictured below, left) provided the only substantive response to Monacelli's questions, and said Monacelli needed to have "press ID" to be treated as a reporter, even though DPD's written policies do not require specific forms of credentials like press badges or laminated passes for journalists covering law enforcement activities.



38.     John Doe Police Officer 3 and other officers would not look at Monacelli's emails or call his editor at the Voice. Instead, when Monacelli continued to object to his arrest and point out that he was a member of the press, he was mocked by officers.

39.     As officers began zip-tying the hands of the people sitting on the bridge, Monacelli asked yet again if he could resume his work.

40.     Specifically, Monacelli told John Doe Police Officer 4 that he was a member of the press and asked why he was being zip tied. John Doe Police Officer 4 would not respond except to say, "You're under arrest."

41.     At around 10:45 p.m., Monacelli's hands were zip tied behind his back by John Doe Police Officer 4.

42.     Monacelli was held in this manner for more than an hour, and was not released until around 11:56 p.m.

43.     Monacelli's detention in addition to being unconstitutional was especially hazardous to his health and mental well being because he was kept in close proximity to hundreds of protesters as COVID-19 spread rapidly throughout North Texas and long before a vaccine was widely available.

44.     Monacelli was also distressed about the injury to his leg. As a result, he asked officers if he could receive medical attention at various times throughout his detention. Various officers declined to provide Monacelli with any medical care.

**C. DPD's Dangerous Policy for the Use of Potentially Deadly Kinetic Impact Projectiles ("KIPs") on Protesters, Bystanders, and Journalists Covering Protests**

45.     Though the names of types of KIP ("rubber", "foam", "bean bag") suggest the ammunition could be safely used on civilian populations at any range, this is not the case. A 2017 study in the medical journal *The BMJ* demonstrates the serious risk to human health from KIP.[7] In the review, which looked at 1,984 people who had been hit by a KIP, the authors found that 53, or 2.7 percent, died from their injuries, while 300, or 15.1 percent, suffered permanent disability as a result.[8]

46.     Given the potential for these types of ammunition to cause lasting physical harm to a significant percentage of people injured by them, the Physicians for Human Rights concluded in 2016 that "KIPs in general are not an appropriate weapon to be used for crowd management and, specifically, for dispersal purposes" and "KIPs should never be fired at close range."[9]

47.     Indeed, because KIPs "are likely to be inaccurate and indiscriminate" due to their size and shape, an officer firing a KIP as a means of dispersing or subduing an individual protester under extreme conditions (such as a protester engaged in violent acts) may be unable to do so without significant risk of injuring bystanders or journalists nearby.[10]

48.     As a result, law enforcement experts have called for the reduced use of KIPs, judges have ordered cities to stop using KIPs in crowd-control situations, and police departments have

---

[7] Rohini J. Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review*, BMJ OPEN (Dec. 5, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.

[8] *Id.* at 1.

[9] Rohini J. Haar & Vincent Iacopino, Joint Report of the Physicians for Human Rights and International Network of Civil Liberties Organizations, *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons*, pp. 93, 94 (March 1 2016).

[10] *Id.* at p. 24.

limited their use on their own.[11] For example, in the aftermath of the George Floyd protests, Austin's police chief instituted changes to the departments policy on protests, stating and said "the deployment of bean bag ammunition will not be used in a crowd situation."[12]

49.     Yet many cities, including the City of Dallas, had ample warning of the dangers posed by KIPs before the 2020 protests. During the September 2018 protests of the death of Botham Jean, a DPD Officer sought to block non-threatening protesters from marching down Cadiz Street by firing multiple rounds of PepperBalls in the direction the crowd.[13] The day after the incident, then-DPD Chief Renee Hall said in a video published online that she was "concerned to learn of reports that one of our officers deployed potentially several pepper balls during a demonstration last night . . . They are only to be utilized if instructed to do so by the on[-]scene commander or if there is an immediate threat to the public."[14]

50.     Chief Hall never suggested (nor did video of the incident indicate) that any protester was threatening "unlawful property damage or physical force" as the DPD's most updated written policy now requires before an officer fires a PepperBall gun in a crowd-control situation.[15] Instead, the officer who fired PepperBalls stated he was "keep[ing] protesters back" as they sought to turn onto Cadiz Street, after his hand gestures and voice commands did not work.[16]

---

[11] Liz Szabo, Jay Hancock, Kevin, McCoy, Donovan Slack, and Dennis Wagner, *Fractured Skulls, Lost Eyes: Police Break their Own Rules when Shooting Protesters with 'Rubber Bullets'*, USA TODAY & KAISER HEALTH NEWS (June 19, 2020), https://www.usatoday.com/in-depth/news/nation/2020/06/19/police-break-rules-shooting-protesters-rubber-bullets-less-lethal-projectiles/3211421001/.
[12] Russell Falcon, *APD Won't Use Bean Bag Rounds Anymore, Chief Says*, KXAN (June 4, 2020), https://www.kxan.com/austin-george-floyd-mike-ramos-protests/bean-bag-rounds-wont-be-used-by-austin-police-starting-this-week-apd-chief-says/.
[13] Cassandra Jaramillo, *Chief Orders Review After Dallas Cop Caught on Video Shooting Pepper Balls at Botham Jean Protest*, DALLAS MORNING NEWS (Sept. 11, 2018), https://www.dallasnews.com/news/crime/2018/09/11/chief-orders-review-after-dallas-cop-caught-on-video-shooting-pepper-balls-at- botham-jean-protest/.
[14] *Id.*
[15] DPD General Orders, § 902.02(E)(2)(c)
[16] Cassandra Jaramillo, *Dallas Officer's Pepper-Ball Use During Botham Jean Protest Deemed 'Consistent' with Policy*, DALLAS MORNING NEWS (Dec. 28, 2018), https://www.dallasnews.com/news/2018/12/28/dallas-officers-pepper-ball-use-during-botham-jean-protest-deemed-consistent-with-policy/

51.     Public records obtained by the news media demonstrated that the officer who fired the PepperBall gun had let his certification for use of that weapon lapse by a year and that he also failed to inspect after the gun was issued to him for his shift— both are violations of DPD's written policy.[17]

52.     The DPD reviewed the incident and issued a preliminary report. In spite of the policy violations with regard to the officer's lapsed certification and his failure to inspect his weapon after it was issued to him for his shift, the Department deemed his actions "'consistent' with the department's general orders."[18]

53.     This public endorsement of the use of KIP by an unqualified officer on non-threatening protesters sent clear messages that were on display less than two years later when officers shot Monacelli and others during the George Floyd protests the night of June first: (1) City practice is that Officers are free to use the deadly weapons on crowds in a manner that violates DPD written policy and without departmental consequence, and (2) a lack of training to maintain proper certification for using KIPs should not deter officers from firing KIPs into crowds of non-violent, non-threatening protesters.

54.     But the June First incident which forms the basis of this complaint does not stand as an outlier of Dallas police behavior in the George Floyd protests. Just the night before, a photographer documented a veteran Dallas Police officer shooting pepper balls in the chest of an unarmed, non-violent protester, Jantzen Verastique.[19] An image of the incident shows DPD Sgt. Roger Rudloff firing the weapon at Verastique at point-blank range before ordering her arrest.[20]

---

[17] *Id.*; DPD General Orders, §§ 902.02(D)(2), 902.02(K)(5).
[18] Jaramillo (Dec. 28, 2018), *supra*, note 16.
[19] Miles Moffeit, Cassandra Jaramillo, and Dianne Solis, *'I Felt Like My Chest Was On Fire': Photo Shows Dallas Police Officer Shooting Proester With Pepper-Ball Gun*, DALLAS MORNING NEWS, Aug. 9, 2020, https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/.
[20] *Id.*

Verastique, fellow demonstrators, and the photographer spent a night in jail, but their charges were dropped in mid-June.[21]

55.    DPD reviewed the shooting incident as part of a criminal investigation into Sgt. Rudloff's conduct.[22] However, DPD closed the case in March with a spokesperson telling the *Dallas Morning News* that "investigators concluded there was no evidence to show the officer committed a crime."[23] In so doing, the City again sanctioned and ratified the use of KIP against unarmed, non-violent individuals at protests moving forward.

56.    In June, 2020, United States District Court Judge Sam Lindsay issued a temporary injunction, in response to civil rights lawsuit brought by two black Dallas-area residents, prohibiting DPD's use of "'less lethal' weapons, such as tear gas, smoke bombs, flashbangs, pepper balls, mace, and other chemical agents in connection with protests" against those not posing a threat, along with the "firing or deploying kinetic impact projectiles into a crowd for any purpose."[24] This injunction expired on Nov. 16, 2020,[25] allowing DPD to resume its unconstitutional practice of using KIP on nonviolent protesters.

57.    The Botham Jean incident and DPD's extensive use of KIP during the George Floyd protests establish an unconstitutional pattern and practice of excessive force for the dispersal of non-violent protesters in Dallas. This particular pattern and practice, does not only affect

---

[21] *Id.*

[22] Miles Moffeit, Cassandra Jaramillo, and Madi Alexander, *Dallas Police Secretly Dropped Investigation into Officer who Shot Protester with Pepper-Ball Gun*, DALLAS MORNING NEWS, Sept. 10, 2021, https://www.dallasnews.com/news/investigations/2021/09/10/dallas-police-secretly-dropped-investigation-into-officer-who-shot-protester-with-pepper-ball-gun/

[23] *Id.*

[24] Veronica Gonzalez, Cassandra Jaramillo, and Hayat Normine, *Federal Judge Temporarily Bans Dallas Police, City From Using Tear Gars, Less-Lethal Ammunition During Protests*, DALLAS MORNING NEWS, Jun. 12, 2020, https://www.dallasnews.com/news/courts/2020/06/12/federal-judge-temporarily-bans-dallas-police-city-from-using-tear-gas-less-lethal-ammunition-during-protests/; *See* Casandra Jaramillo, *Civil Rights Attorneys File Lawsuit Against Dallas, Chief Hall And Police Department Following Protests*, https://www.dallasnews.com/news/courts/2020/06/11/civil-rights-attorneys-file-lawsuit-against-dallas-chief-hall-and-police-department-following-protests/

[25] *Williams v. City of Dallas*, No. 3:20-cv-01526, Order Extending Agreed Preliminary Injunction (Oct. 14, 2020).

protesters, however; the DPD's aggressive "kettling" techniques means journalists, bystanders, and even members of the City Council, can get trapped between police lines and demonstrators, in the line of "less than lethal" fire.

58.     Notably, though rubber or sponge bullets are potentially more harmful than PepperBalls, for which DPD has a written policy, no written policy exists specific to the use of these other types of KIP.  Nevertheless, rubber or sponge bullets are part of the DPD's arsenal and have been used by the Department as far back as 2016.[26]

**D. Monacelli's Injuries**

59.     In some respects, Monacelli is lucky his physical injuries were not worse given the inherent danger associated with KIP. For example, a day earlier, aspiring photojournalist Vincent Doyle was shot in the face by officers while filming protests from a parking lot and required hospitalization to treat his injuries.[27]

60.     However, Monacelli suffered other injuries. Since his shooting and arrest on June 1, 2020, Monacelli has begun having stress and anxiety attacks that occur seemingly at random. He has also had trouble sleeping and experiences extreme levels of anxiety when he sees a police officer or police vehicle. As a result, he started seeing a psychiatrist who has prescribed medications for him to manage stress and anxiety.

61.     He was also injured professionally. Because he was shot and detained by police for 2 ½ hours during the Bridge protest, he was unable to gather information and report on several stories he would have pursued otherwise.

---

[26] Lauren Silverman, *Dallas Police To Try 'Sponge Guns' To Help Avoid Deadly Shootings*, KERA News.org (Apr. 28, 2016), https://www.keranews.org/post/dallas-police-try-sponge-guns-help-avoid-deadly-shootings.
[27] Vincent Doyle interview with Dallas Weekly News (@dallasweekly), INSTAGRAM, https://www.instagram.com/p/CBCNvDupZ09/ (last visited Aug. 9, 2021).

**E. The Aftermath**

62.     In the immediate aftermath of Monacelli's arrest, the U.S. Press Freedom Tracker, which tracks incidents across the country where journalists are obstructed from doing their jobs, documented Monacelli's shooting and arrest and that of a Dallas Morning News photographer.[28] Monacelli, acting in his journalistic capacity, has also attempted to determine what projectiles DPD were used on him and others on the Bridge and under what authority. However, in no small part because of DPD's unconstitutional arrest of Monacelli, Monacelli has been hampered in his ability determine exactly what types of ammunition and chemical agents John Doe Police Officers 1 and 2 shot at him and what other officers used that night.

**CLAIMS FOR RELIEF**

**COUNT I**

**Claim Under 42 U.S.C. § 1983 for Violation of
Plaintiff's Fourth and Fourteenth Amendment Rights
(Against the City of Dallas and DPD Officers John Doe Police Officers 1 and 2 in their
individual capacities)**

63.     Monacelli incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

64.     Observing and recording police activity and public protests is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of Texas

---

[28] *Freelance Journalist Struck by Projectiles, then Arrested While Covering Protest on Dallas Bridge*, U.S. PRESS FREEDOM TRACKER (June 1, 2020), https://pressfreedomtracker.us/all-incidents/freelance-journalist-struck-projectiles-then-arrested-while-covering-protest-dallas-bridge/; *Dallas Morning News Photographer Caught in Crossfire Documenting Protesters on Bridge*, U.S. PRESS FREEDOM TRACKER (June 1, 2020), https://pressfreedomtracker.us/all-incidents/dallas-morning-news-photojournalist-caught-crossfire-documenting-protesters-bridge/

and instrumentalities of the state such as the City of Dallas and the DPD under the Fourteenth Amendment.

65.     By shooting Monacelli in the back of the leg and lower back while he observed and recorded the interactions between police officers and protesters as part of a news assignment, John Doe Police Officers 1 and 2 violated Monacelli's First, Fourth and Fourteenth Amendment Rights.

66.     By targeting the periphery of a large crowd during a public event of great local and national significance, John Doe Police Officers 1 and 2, knew or should have known that they would seriously injure journalists covering the plainly newsworthy event, thus making it more difficult if not impossible to continue such coverage.

67.     At all relevant times alleged herein, John Doe Police Officers 1 and 2 were sworn police officers with the Dallas Police Department ("DPD") and acting under color of law.

68.     At all relevant times alleged herein, no citizen, officer, or bystander was in imminent fear for their life because of Monacelli or in fear of Monacelli causing them serious bodily injury.

69.     At all relevant times alleged herein, Monacelli never threatened to harm any property.

70.     At all relevant times alleged herein, Monacelli possessed the right to be free from excessive force.

71.     The City of Dallas and the Dallas Police Department instituted a policy and practice of using excessive force against non-threatening, peaceful protesters and journalists covering protests as a means of intimidation and control.

72.   John Doe Police Officers 1 and 2 used objectively unreasonable force when Monacelli did not pose an imminent threat of death or serious bodily injury to the Defendants or any other person during the relevant time alleged herein.

73.   John Doe Police Officers 1 and 2 further used objectively unreasonable force when Monacelli did not pose any threat of harm to property during the relevant time alleged herein.

74.   A number of officers did not use any force at all that night as such force would have been unreasonable and unjustified. This further shows that Defendant John Doe Police Officers 1 and 2's use of force on protesters was objectively unreasonable.

75.   It is clearly established law that using physical force such as KIPs—including rubber, sponge, paint balls or pepper bullets—against a non-threatening individual is unreasonable and violates the Fourth Amendment right to be secure in their person. And, given the gross disparity between the need for force and the level of pain and injury inflicted, the officers' use of force was malicious.

76.   John Doe Police Officers 1 and 2 acted unlawfully in shooting KIPs at a non-threatening and peaceful crowd. Moreover, the use of KIPs was unwarranted and excessive to any articulated need of dispersing protesters from the Bridge and excessive to the purported need of making arrests.

77.   Defendants' use of force was also inappropriate and unwarranted as a way to control the crowd of protesters, public officials, and journalists, and was in violation of Monacelli's Fourteenth Amendment rights to due process.

78.   The excessive force used by John Doe Police Officers 1 and 2 is the direct result of the City of Dallas' *de facto* unwritten policy and practice that allows police to use so-called "less lethal" ammunition and devices against a crowd, including against protesters who are not

immediately threatening the physical safety of anyone. The City of Dallas knew since at least the 2018 protests following Botham Jean's death of the obvious risk that KIPs would cause the type of physical and constitutional injuries that Monacelli has suffered. And the City of Dallas has used sponge or rubber bullet KIPs since at least 2016. Yet the City has never developed any policy, written or unwritten, regarding their constitutional use and, thus, it was highly predictable that DPD officers would continue to violate protesters', bystanders', journalists', and citizens' constitutional rights using sponge or rubber bullets and other KIPs. Accordingly, the City of Dallas has been deliberately indifferent to the complete lack of training, or completely inadequate training, they have given DPD officers on these "less lethal" forms of ammunition.

79.    The written and unwritten polices of the Defendant, therefore, are the moving forces behind Monacelli's constitutional injuries inflicted through the excessive force of John Doe Police Officers 1 and 2.

80.    As a direct and proximate cause of Defendants' use of excessive force, Monacelli suffered and continues to suffer serious injuries including, but not limited to, emotional distress and physical pain and suffering.

### COUNT II
### Claim under 42 U.S.C. § 1983 for Violation of Plaintiff's
### First and Fourteenth Amendment Rights
### Against the City of Dallas and
### John Doe Police Officers 1-4 in their individual capacities

81.    Monacelli incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

82.    Observing and recording police activity and public protests is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of Texas

and instrumentalities of the state such as the City of Dallas and the DPD under the Fourteenth Amendment.

83.     Monacelli engaged in the constitutionally protected act of observing, recording, and reporting on the march that was halted on the Bridge. Monacelli hopes to continue covering similar events in his capacity as a journalist moving forward.

84.     By shooting Monacelli on June 1, 2020, as he documented the protest from the shoulder of the Bridge, John Doe Police Officer 1 and 2 violated Monacelli's First Amendment rights and obstructed his ability to gather news.

85.     By arresting and detaining Monacelli on June 1, 2020, and continuing to detain him for 2 ½ hours despite his conspicuously wearing "PRESS" on his clothing and equipment and despite his repeated offers to demonstrate through email records that he was a journalist on assignment, John Doe Police Officers 3 and 4 violated Monacelli's First Amendment rights and obstructed his ability to gather news for an article that night.

86.     Monacelli informed Officers John Doe Police Officers 3 and 4 that he was a member of the Press as his clothing indicated and as his credentials would have validated. Rather than believe Monacelli, attempt to verify Monacelli's profession, or reach out to a superior officer or member of the DPD Media Relations team to verify Monacelli's credentials, they instead ignored his repeated attempts to demonstrate his status as a journalist.

87.     The conduct of John Doe Police Officers 3 and 4 violated clearly established First Amendment rights, of which John Doe Police Officers 3 and 4 knew, or which a reasonable police officers should have known, rendering them liable to Monacelli under 42 U.S.C. § 1983.

88.    As a direct and proximate result of the actions of John Doe Police Officers 1-4, Monacelli suffered damages including mental anguish, professional injuries, damage to his reputation, and impairment of his First Amendment rights.

89.    At all times, John Doe Police Officers 1-4 were acting within the scope of their employment by the City of Dallas and under color of state law.

**COUNT III**
**Claim under 42 U.S.C. § 1983 for Violation of Plaintiff's**
**Fourth Amendment Rights (Unlawful Seizure)**
**Against the City of Dallas and**
**John Doe Police Officers 1-4 in their individual capacities**

90.    Monacelli incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

91.    Under the Fourth Amendment to the United States Constitution, as applied to the State of Texas and instrumentalities of the state such as the City of Dallas and the DPD under the Fourteenth Amendment, Monacelli has a right to be free from unreasonable searches and seizures, including unlawful detention, seizure, and arrest that is not supported by a warrant, probable cause, or reasonable suspicion that Monacelli had engaged in, was engaging in, or was about to engage in any criminal conduct.

92.    Defendants seized Monacelli when John Doe Police Officers 1-4 willingly terminated his freedom of movement by the use of "kettling," by shooting him with a KIP, by threatening to use additional force upon him, and by arresting him for about 2 ½ hours. At all relevant times, Monacelli did not commit a crime and Defendants did not have reasonable suspicion to believe Monacelli had engaged in, was engaging in, or was about to engage in any criminal conduct. John Doe Police Officers 1-4  intentionally suppressed Monacelli's rights under the Fourth Amendment by unlawfully "kettling," shooting, and arresting him for doing nothing

more than observing, photographing, and videotaping the June 1, 2020, protest and march. John Doe Police Officers 3 and 4 further suppressed Monacelli's Fourth Amendment rights by repeatedly refusing to accept Monacelli's press credentials and failing to take any additional steps to verify Monacelli's identity or whether Monacelli posed a threat to anyone. There was also nothing to suggest that Monacelli posed a threat in a way that required such restraint.

93.     John Doe Police Officers 1-4 acted willfully, deliberately, maliciously, or with reckless disregard for Monacelli's exercise of his clearly established rights protected by the Fourth and Fourteenth Amendments to the U.S. Constitution.

94.     As a direct and proximate result of John Doe Police Officers 1-4's unlawful detention, seizure, and arrest, Monacelli suffered damages, including mental anguish and professional injuries.

**COUNT IV**

**Claim under 42 U.S.C. § 1983 and**
***Monell v. Dept. of Soc. Servs. Of the City of New York*, 436 U.S. 658 (1978)**
**for Violation of Plaintiff's First, Fourth, and Fourteenth Amendment Rights**
**Against the City of Dallas**

95.     Monacelli incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

96.     The City of Dallas is directly responsible for training on the use of firearms with regard to allegedly less lethal impact weapons and kinetic impact projectiles ("KIPs").

97.     The City of Dallas knew of the risk associated with the 40mm eXact iMpact extended range sponge round but failed to institute any training with regard to the range and risks of significant injury from the projectile.

98.     The City of Dallas knew as of 2018 that DPD officers were using KIPs including PepperBalls as a means of crowd control for non-threatening protesters in violation of the General Orders of the DPD and the U.S. Constitution, and it knew that the use of KIPs in this manner was a widespread practice in the DPD.

99.     The use of KIPs against peaceful protesters was so common and well-settled that it represented municipal policy. And by not condemning the use of KIPs in this way, the City of Dallas ratified the practice.

100.    By ratifying the use of KIPs on peaceful, non-threatening protester, the City of Dallas deterred the exercise of protesters' right to assemble and petition the government, as well as Monacelli's First Amendment right to gather news. This constitutes an outrageous and reckless use of force ratified by the City of Dallas's policymaker.

101.    Additionally, the City of Dallas is directly responsible for training officers on its news media requirements and privileges policies, including when it is and is not appropriate to restrict the movement of journalists.

102.    In detaining and arresting Monacelli without probable cause or reasonable suspicion on June 1, 2020, John Doe Police Officers 3 and 4 violated Monacelli's clearly established First, Fourth, and Fourteenth Amendment rights.

103.    At all times relevant to this Complaint, John Doe Police Officers 1-4 were acting under the color of state law.

104.    At all times relevant to this Complaint, DPD had a policy to "not restrict movement of newspersons, unless their actions clearly and directly interfere with police operations or investigations." Monacelli never acted in a way that clearly or directly interfered with police officers as they engaged the bridge protesters. Moreover, John Doe Police Officers 1-4 gave no

indication of how Monacelli was perceived to have intervened in the police operations during the peaceful protests before, during, or after Monacelli's unlawful detention. Additionally, Monacelli was given no opportunity or instruction to move to an area of the bridge where he would not obstruct police operations though he attempted to report from the shoulder of the bridge the entire time he was on it. Defendant City of Dallas was deliberately indifferent in its failure to train or supervise John Doe Police Officers 1-4  to follow this DPD policy, and this failure to train led to the deprivation of Monacelli's constitutional rights, as shown by, among other things, John Doe Police Officers 1 and 2's shooting of Monacelli as he sought to report on a protest and John Doe Police Officers 3 and 4's refusal to accept Monacelli's repeated offers to prove that he was a working journalist.

105.    At all times relevant to this Complaint, DPD had a policy that "Members of the media must display appropriate press credentials . . . ." Monacelli carried with him on his cell phone an email that clearly showed he was on assignment on June 1, 2020, with contact information for Monacelli's editor. Moreover, he prominently marked his clothing with the words "PRESS" in large lettering so that he could be identified even from a great distance. Before and during his unlawful detention, Monacelli repeatedly attempted to show John Doe Police Officers 3 and 4 that he was a member of the press. John Doe Police Officers 3 and 4 repeatedly refused to look at Monacelli's emails. John Doe Police Officers 3 insisted incorrectly and in contrast to the DPD policy that members of the media could only be recognized by possessing a press identification card.

106.    At the time of Monacelli's detention, DPD also had failed to adequately train, supervise, or discipline its officers about the First Amendment right to photograph and video in public, including during public protests.

107.    The failure to train on proper protest containment tactics, the use of kinetic impact projectiles, and the violation of the constitutional rights of journalists, collectively represent a deliberate choice by the City of Dallas.

108.    This failure to train, supervise, or discipline resulted in John Doe Police Officers 3 and 4's violation of Monacelli's constitutional rights, which took the form of his arrest and prolonged detainment even as Monacelli repeatedly sought to show that he was a member of the press and continue to document the protest and police response.

109.    As a result, Monacelli was unable to continue his work that night as a journalist or turn in his planned assignment for the Dallas Voice.

110.    Because DPD's failure to train officers on its policies and practices were the moving force behind John Doe Police Officers 3 and 4's violation of Monacelli's constitutional rights, DPD is liable under 42 U.S.C. § 1983.

111.    As a direct and proximate result of DPD's unconstitutional policies and practices, Monacelli suffered damages, including mental anguish, professional injuries, and damage to his reputation.

## ATTORNEY'S FEES AND COSTS

112.    Monacelli has been compelled to engage counsel and file this lawsuit. Pursuant to 42 U.S.C. § 1988, Monacelli is entitled to recover from Defendants his reasonable and necessary attorney's fees and costs of court.

## JURY DEMAND

113.    Monacelli demands a jury trial of all claims in the Complaint to which a jury trial is available.

## PRAYER

Wherefore, Monacelli respectfully prays that this Court grant the following relief:

a.  A declaratory judgment that the shooting of Monacelli carried out by the relevant DPD

Officer Defendants violated his constitutional rights under the First, Fourth, and

Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

b.  A declaratory judgment that the arrest of Monacelli carried out by the relevant DPD

Officer Defendants violated his constitutional rights under the First, Fourth, and

Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

c.  A declaratory judgment that the violations by the DPD Officer Defendants of the First

and Fourth Amendment rights of Monacelli were committed pursuant to a municipal

policy, practice, and custom of the City of Dallas, acting through the DPD, of

obstructing, interfering with, and retaliating against the recording of police activity by

journalists and members of the public;

d.  Injunctive relief (i) enjoining the City of Dallas, acting through the DPD, from interfering

with, targeting, arresting, or using physical force against, members of the press and

public who are peacefully recording police activity in public places; and (ii) ordering the

City of Dallas to develop and implement a comprehensive and effective policy of

training, supervision, and discipline of DPD officers to protect the First Amendment

rights of the press and public to observe and record police activity in public places,

including appropriate procedures to test the effectiveness of that policy;

e.  An award to Monacelli of actual damages for his mental anguish, professional injuries,

and physical injuries, in an amount to be determined at trial;

f.  Awarding Monacelli his reasonable attorneys' fees and and litigation costs under 42

U.S.C. § 1988;

g.  pre- and post-judgment interest;

h.   Such other relief that this Court may deem just, proper, and appropriate.

Respectfully submitted,

By: */S/ Michael W. Shapiro*
Michael W. Shapiro
Texas Bar No. 24120472
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, Texas 75275
Tel.: (214) 768-4077
Fax: (214) 768-1611
Email: mshapiro@smu.edu

By: */S/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 600
Dallas, TX 75208
Telephone: (737) 808-2260
Facsimile: (469) 903-6000

***Counsel for Steven M. Monacelli***

**CERTIFICATE OF SERVICE**

I hereby certify that on this <u>26th</u> day of October, 2021, a true and correct copy of the foregoing document was tendered for filing to the Clerk of the U.S. District Court for the Northern District of Texas using the Court's CM/ECF system.

*/s/ David W. Henderson*
David W. Henderson