**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **STEVEN M. MONACELLI,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:21-cv-2649** |
| **CITY OF DALLAS and OFFICERS** | § | |
| **JOHN DOE 1-4, individually and in** | § | |
| **his official capacity as a Dallas Police** | § | |
| **Department Police Officer,** | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF'S RESPONSE TO THE CITY OF DALLAS'S MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 5

FACTUAL SUMMARY .................................................................................. 5

ARGUMENT ................................................................................................... 7

    **A.** COURTS APPLY A LIBERAL PLEADING STANDARD FOR MUNICIPAL LIABILITY UNDER § 1983 ON A 12(B)(6) MOTION TO DISMISS. ............................................................... 7

    **B.** MONACELLI HAS SUFFICIENTLY PLED MUNICIPAL LIABILITY UNDER § 1983. ................. 8

      *1. Monacelli sufficiently pled an official policy of unconstitutional use of KIPs on peaceful protesters and journalists covering protest events.* ................................................. 10

      *2. Monacelli sufficiently pled a policymaker with actual or constructive knowledge acted with indifference.* ......................................................................................... 15

      *3. Monacelli sufficiently alleged the City's KIP policy was the "moving force" behind the Fourth Amendment violation.* ........................................................................ 20

      *4. Monacelli sufficiently alleged his failure-to-train claim regarding the City's lack of training its officers in the First Amendment right to photograph and film in public.* .......... 21

        *i. Monacelli sufficiently pled officers were inadequately trained as to the First Amendment right to film in public and as a result caused his injuries.* ........................... 22

        *ii. Monacelli has sufficiently pled a pattern of violations establishing the City's deliberate indifference in failing to train with regard to a policy.* ................................... 23

**CONCLUSION** ............................................................................................. 24

## **TABLE OF AUTHORITIES**

**CASES**

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009)..................................................................................................... 8
*Beattie v. Madison Cnty. Sch. Dist.*
  254 F.3d 595 (5th Cir. 2001) ............................................................................... 17, 19
*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007)................................................................................................ 8, 10
*Bennet v. Pippin*
  74 F.3d 578 (5th Cir. 1996) ........................................................................................ 12
*Bennett v. City of Slidell*
  728 F.2d 762 (5th Cir. 1984) ............................................................................... 16, 20
*Bramlett v. Bell*
  2004 WL 1243684 (E.D. La. June 3, 2004)................................................................ 11
*Burge v. St. Tammany Parish*
  336 F.3d 363 (5th Cir. 2003) ...................................................................................... 12
*Carmona v. City of Dallas*
  2020 WL 2812859 (N.D. Tex. May 28, 2020) ........................................................... 10
*Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*
  690 F.2d 1157 (5th Cir.1982) ..................................................................................... 24
*Cuvillier v. Taylor*
  503 F.3d 397 (5th Cir. 2007) .................................................................................. 8, 10
*E.G. ex rel. Gonzalez v. Bond*
  2016 WL 8672774 (N.D. Tex. Sept. 9, 2016) ............................................................. 8
*Est. of Davis ex rel. McCully v. City of N. Richland Hills*
  406 F.3d 375 (5th Cir. 2005) ...................................................................................... 23
*Fuentes v. Nueces Cnty.*
  689 F. App'x 775 (5th Cir. 2017) ............................................................................... 11
*Gallaher v. City of Maypearl*
  2018 WL 700252 (N.D. Tex. Feb. 2, 2018) ......................................................... 10, 13
*Garza v. City of Donna*
  922 F.3d 626 (5th Cir. 2019) ....................................................................... 12, 15, 18
*Gibson v. City of Garland*
  2016 WL 5819821 (N.D. Tex. Sept. 1, 2016) ........................................................... 11
*Gonzalez v. Ysleta Independent Sch. Dist.*
  996 F.2d 745 (5th Cir.1993) ....................................................................................... 12
*Grandstaff v. City of Borger*
  767 F.2d 161 (5th Cir. 1985) ...................................................................................... 10
*Groden v. City of Dallas*
  826 F.3d 280 (5th Cir. 2016) ...................................................................................... 15
*Harbin v. Cmty. Educ. Ctrs., Inc.*
  2012 WL 3073752 (E.D. Tex. June 14, 2012)............................................................. 7
*Hicks-Fields v. Harris Cnty.*
  860 F.3d 803 (5th Cir. 2017) ........................................................................................ 9
*Hobart v. Estrada*
  582 F. App'x 348 (5th Cir. 2014)......................................................................... 12, 17
*Hughes v. City of Dallas*
  2020 WL 4670659 (N.D. Tex. Aug. 11, 2020)........................................................... 15
*Jacobsen v. Osbourne*
  133 F.3d 315 (5th Cir.1998) ....................................................................................... 24

*Johnson v. City of Shelby*
572 U.S. 10 (2014)............................................................................................... 15

*Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*
379 F.3d 293 (5th Cir. 2004) ............................................................................... 11

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*
677 F.2d 1045 (5th Cir. 1982) ............................................................................... 7

*Kitchen v. Dallas Cnty.*
759 F.3d 468 (5th Cir. 2014) ............................................................................... 21

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*
507 U.S. 163 (1993)............................................................................................... 8

*Liggins v. City of Duncanville*
2021 WL 929105 (N.D. Tex. 2021) ...................................................................... 12

*Louzi v. Fort Bend Cnty.*
2020 WL 5040436 (S.D. Tex. Aug. 26, 2020) ............................................... 11, 14

*Monell v. Dep't of Soc. Servs.*
436 U.S. 658 (1978)............................................................................................... 9

*Peña v. City of Rio Grande City*
879 F.3d 613 (5th Cir. 2019) ....................................................................... 8, 10, 15

*Peterson v. City of Fort Worth*
588 F.3d 838 (5th Cir. 2009) ....................................................................... 11, 14, 15

*Pineda v. City of Houston*
291 F.3d 325 (5th Cir. 2002) ............................................................................... 10

*Pinedo v. City of Dallas*
2015 WL 221085 (N.D. Tex. 2015) ...................................................................... 18

*Piotrowski v. City of Houston*
51 F.3d 512 (5th Cir. 1995) ................................................................................... 9

*Robinson v. City of Garland*
2016 WL 7396048 (N.D. Tex. 2016) .................................................................... 17

*Robles v. Ciarletta*
797 F. App'x. 821 (5th Cir. 2019) .................................................................... 21, 23

*Snyder v. Trepagnier*
142 F.3d 791 (5th Cir. 1998) ............................................................................... 14

*Sosa v. Coleman*
646 F.2d 991 (5th Cir. 1981) ................................................................................. 7

*Teames v. Henry*
2004 WL 2186549 (N.D. Tex. Sept. 29, 2004) ..................................................... 11

*Thomas v. City of Galveston*
800 F. Supp. 2d 826 (S.D. Tex. 2011) ............................................................... 8, 10

*Tinoco v. Raleeh*
2006 WL 27287 (E.D. Tex. Jan 5, 2006)................................................................ 8

*Turner v. Driver*
848 F.3d 678 (5th Cir. 2017) ............................................................................... 22

*Webster v. City of Houston*
735 F.2d 838 (5th Cir. 1984) ............................................................................... 16

*Zarnow v. City of Wichita Falls*
614 F.3d 161 (5th Cir. 2010) ........................................................................ passim

**STATUTES**

42 U.S.C. § 1983 ............................................................................................. 5, 9

Plaintiff Steven Monacelli (Monacelli) files this Response to Defendant City of Dallas's (the City) Motion to Dismiss. Monacelli's First Amended Complaint pleads factual allegations that, taken as true, state plausible claims against Defendant requiring denial of the Motion.

## INTRODUCTION

Monacelli has pled factual allegations of Defendant's liability under 42 U.S.C. § 1983 for violation of his First and Fourth Amendment rights. The Dallas Police Department (DPD) deprived freelance reporter Monacelli of his First and Fourth Amendment rights during a protest against the death of George Floyd by shooting him multiple times with Kinetic Impact Projectiles (KIP or KIPs) and then arresting him for two and a half hours. The arresting police officers ignored his repeated attempts to show proof that he is a journalist, thus blocking him from further filming the events. DPD's use of excessive force and arrest of Monacelli injured him and obstructed his ability to engage in classic First Amendment activity—including reporting on the use of excessive force by police.

## FACTUAL SUMMARY

On June 1, 2020, Monacelli was on assignment for The Dallas Voice (The Voice) covering one of several days of the protests. First Am. Compl. ¶ 18. That night, hundreds of demonstrators marched onto the Margaret Hunt Hill Bridge (the Bridge). *Id.* ¶¶ 20–21. Monacelli moved along with them, filmed the protest on his phone, and generally observed. *Id.* ¶¶ 20, 22. Before arriving at the protest, Monacelli wrote "PRESS" in large black lettering on his shirt, backpack, and white helmet to make clear he was attending in his capacity as a journalist. *Id.* ¶¶ 32, 36. He also had emails on his phone from his editor at The Voice, along with her contact information, ready to show that he attended the protest on assignment. *Id.* ¶ 32.

Once on the Bridge, protesters, other journalists, and a city council member were quickly penned in by a line of DPD officers who blocked their path in the front while another group of

officers in armored vehicles blocked them from behind. *Id.* ¶ 22. Monacelli stayed toward the front of the crowd, keeping to the shoulder as it moved onto the Bridge. *Id.* ¶¶ 20–21. Officers in the line deployed chemical irritants and KIPs at the crowd. *Id.* ¶¶ 23–25. After being exposed to the chemicals and regrouping, Monacelli filmed protesters moving away from police. *Id.* ¶ 26. When he turned his back to the police line to film the protestors in retreat, officers shot him in the back of a leg with a KIP. *Id.* ¶¶ 27–28. They also shot him in the back with a green paintball. *Id.* ¶ 29.

Officers then arrested hundreds of people, including Monacelli. *Id.* ¶ 31. They ordered Monacelli to sit, zip-tied his wrists, and kept him sitting on the Bridge for the next two and a half hours. *Id.* ¶¶ 33, 41. None of the officers who zip-tied him would provide a reason for his arrest; only one would only confirm that he was under arrest. *Id.* ¶ 40. Monacelli repeatedly told any officer in earshot that he was a member of the press and offered to show proof of his assignment in the form of emails from his editor. *Id.* ¶¶ 34, 36, 39. When he again sought an explanation for his arrest, officers told him that he specifically needed a "Press ID," despite DPD's written policies which do not require reporters to carry badges or laminated identification on their persons to access police-controlled scenes and areas. *Id.* ¶ 37. Officers refused to look at Monacelli's emails or call his editor. *Id.* ¶ 38. During the course of the arrest, Monacelli was unable to continue his work as a reporter and was hindered in his pursuit of several stories related to the events on the Bridge. *Id.* ¶¶ 31, 61. In addition to the injury to his leg, Monacelli began experiencing stress and anxiety attacks in the days following shooting and arrest. *Id.* ¶ 60.

The City's policy and/or custom of using KIPs on protesters, and the journalists that are assigned to cover protests, improperly allowed this shooting to take place. His arrest arises out of the (1) the City's failure to train officers on the right to film and photograph in public and (2) a failure inherent in DPD's policies to identify members of the press.

In 2018, a DPD officer sought to stop peaceful protesters—who were inspired to march after the shooting death of Botham Jean—from proceeding down a Dallas street. *Id.* ¶ 49. He fired multiple rounds of pepper balls in the direction of the crowd to deter them from marching. *Id.* DPD's use of KIPs quickly generated considerable controversy. *Id.* Then-DPD Chief Renee Hall gave a statement about the shooting, voicing concern and describing standards for KIP use: "They are only to be utilized if instructed to do so by the on[-]scene commander or if there is an immediate threat to the public." *Id.* The DPD later issued an incident report, receiving significant press attention, that concluded that the officer's actions were "consistent" with its general orders. *Id.*

Two years later, during the Dallas George Floyd protests, DPD officers again used KIPs on peaceful protesters, including Monacelli and a number of photographers. *Id.* ¶¶ 30, 54, 59. During the same protests, DPD officers infringed upon First Amendment rights to film and photograph in public by obstructing a number of protesters and journalists filming and photographing the protests. ¶¶ 30 n. 6, 54, 54 n. 19, 59.

## ARGUMENT

### A. Courts apply a liberal pleading standard for municipal liability under § 1983 on a 12(b)(6) Motion to Dismiss.

Generally, "[m]otions to dismiss under FED. R. CIV. P. 12(b)(6) are viewed with disfavor and are rarely granted." *Harbin v. Cmty. Educ. Ctrs., Inc.,* 2012 WL 3073752, at *2 (E.D. Tex. June 14, 2012) (citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)), *report and recommendation adopted,* 2012 WL 3074686, at *1 (E.D. Tex. July 27, 2012); *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981). Prior decisions of both the United States Supreme Court and the Fifth Circuit Court of Appeals have made it clear that motions to dismiss for failure to state a claim upon which relief can be granted should not be granted lightly.

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, a complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[S]ufficient procedures are available to defendants to seek summary disposition of a lawsuit after a plaintiff has been afforded some opportunity to develop facts to support her complaint." *Tinoco v. Raleeh*, 2006 WL 27287, at *1 (E.D. Tex. Jan 5, 2006).

In the § 1983 context, notice pleading at the motion to dismiss stage is all that is required. *See, e.g.*, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168–69 (1993) (finding that § 1983 claims against municipalities do not require heightened pleading and "litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later"). For this reason, "[if] a plaintiff provides more than a boilerplate recitation of the grounds of municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being sued," dismissal is inappropriate. *E.G. ex rel. Gonzalez v. Bond*, 2016 WL 8672774, at *6 (N.D. Tex. Sept. 9, 2016) (citing *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 844–45 (S.D. Tex. 2011)); *see also Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2019) (stating that a plaintiff alleging a § 1983 claim "need not offer proof of her allegations at th[e pleading] stage").

**B.  Monacelli has sufficiently pled municipal liability under § 1983.**

Monacelli has sufficiently pled that the City violated his rights under 42 U.S.C. § 1983. Section 1983 provides that any person who

> under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The Supreme Court, moreover, has extended § 1983 liability to "municipalities and other local governments." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To prevail on a § 1983 claim, a plaintiff must show that (1) a person acting under color of state law committed the offending conduct; and (2) the conduct deprived the plaintiff of rights secured under the Constitution or federal law. *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995).

The Supreme Court further explained that liability under the statute extends to municipalities such that they "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. at 690. Significantly, the Supreme Court explained that a city may also be held liable for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decisionmaking channels." *Id.* This "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Id.* at 692. Courts have interpreted § 1983 liability to attach when there is: (1) proof of an official policy or custom; (2) which was promulgated by the municipal policymaker; (3) resulting in a constitutional violation whose "moving force" is that policy or custom. *See, e.g.*, *Monell,* 436 U.S. at 690; *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017); *Pineda v. City of Houston,* 291 F.3d

325, 328 (5th Cir. 2002); *Carmona v. City of Dallas*, 2020 WL 2812859, at *5 (N.D. Tex. May 28, 2020). Plaintiffs do not need to offer proof of each of these factors, but rather only enough facts that would plausibly support each above element of § 1983 municipal liability. *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (citation omitted).

Monacelli has submitted factual allegations that "when assumed to be true 'raise a right to relief above the speculative level'" as is required before discovery. *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Thus, the City's Motion should be denied.

**1. Monacelli sufficiently pled an official policy of unconstitutional use of KIPs on peaceful protesters and journalists covering protest events.**

The City argues in its motion that the complaint fails to allege a municipal policy that was the moving force behind the constitutional violations. Mot. to Dismiss 8–12. However, the City overstates what a plaintiff must allege to show a municipal custom.

The Fifth Circuit recognizes that "an injured plaintiff is not likely to document proof of a policy or disposition, either of the policymaker or throughout the police force, that disregards human life and safety." *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (finding liability under § 1983 though there was no evidence of the state of mind of the policymaker from which to infer the city's policy). Indeed, it is "exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011). For this reason, a plaintiff need not "specifically state what the policy is and can rely on minimal factual allegations at th[e] [motion to dismiss] stage of the litigation." *Gallaher v. City of Maypearl*, 2018 WL 700252, at *3 (N.D. Tex. Feb. 2, 2018) (internal citations omitted) *appeal dismissed*, 772 F. App'x 250 (5th Cir. 2019). Furthermore, it would be "wholly

unreasonable to require a plaintiff at this stage of the litigation to allege with specificity all of the other acts by other officers that [plaintiff] will rely upon to demonstrate a policy. No plaintiff can do that before discovery." *Bramlett v. Bell*, 2004 WL 1243684, at *3 (E.D. La. June 3, 2004).

An official policy includes a "persistent, widespread practice of city officials or employees, which although not authorized by officially adopted or promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Teames v. Henry*, 2004 WL 2186549, at *3 (N.D. Tex. Sept. 29, 2004) (citing *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)).

For this reason, a plaintiff may prove the existence of a "custom or policy" through a pattern of unconstitutional conduct on the part of municipal actors or employees. *See Gibson v. City of Garland*, 2016 WL 5819821, at *6 (N.D. Tex. Sept. 1, 2016) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010)). As the City itself notes, "there is no rigid rule regarding numerosity" for courts determining whether some number of constitutional violations amounts to a "pattern" so as to allow for municipal liability. *Fuentes v. Nueces Cnty.*, 689 F. App'x 775, 778 (5th Cir. 2017); *compare Peterson v. City of Fort Worth*, 588 F.3d 838, 850–52 (5th Cir. 2009) (twenty-seven incidents of excessive force over a three-year period insufficient to establish a pattern) *with Louzi v. Fort Bend Cnty.*, 2020 WL 5040436, at *5 (S.D. Tex. Aug. 26, 2020) (three incidents over sixteen months sufficient to establish a pattern). Rather, the Fifth Circuit instructs that the analysis of whether a pattern is adequately pled depends highly on "context." *Peterson*, 588 F.3d at 851–52, 851 n.4.

Additionally, in the absence of a pattern of unconstitutional conduct, a plaintiff can establish a "custom or policy" through an official policymaker's single instance of conduct or decision that was unconstitutional or was adopted with "deliberate indifference to the known or

obvious fact that such constitutional violations would result." *See Liggins v. City of Duncanville,* 2021 WL 929105, at *9 (N.D. Tex. 2021); *see also Garza v. City of Donna,* 922 F.3d 626, 637-38 (5th Cir. 2019) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003) ("Deliberate indifference may be inferred from a pattern of constitutional violations or, absent proof of a pattern, from 'showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights.'")).

Further, a single incident or decision creates municipal liability when the official policymaker's relevant conduct or decision is within the sphere of the official's final and official authority. *See Bennet v. Pippin,* 74 F.3d 578, 586 (5th Cir. 1996). In such cases, the existence of a well-established officially-adopted policy will not insulate the municipality from liability. *Id.* (citing *Gonzalez v. Ysleta Independent School District*, 996 F.2d 745, 754 (5th Cir.1993)). In order to establish municipal liability for a single act or decision, an official policymaker's conduct must be unconstitutional or display "deliberate indifference [that] flow[s] from knowledge of the effects of decisions or conditions and taking no steps to correct the shortcomings," thereby demonstrating the single-incident exception. *See Hobart v. Estrada*, 582 Fed. Appx. 348, 358 (5th Cir. 2014).

Monacelli alleges more than simply "one Botham Jean protest Pepperball incident . . . and an alleged event a mere day earlier." Mot. to Dismiss 10. The Complaint puts the Botham Jean protest incident in context: an officer shooting pepper balls in the direction of an assembled protest and the ensuing controversy made the City aware of its unconstitutional policy surrounding KIPs going back to 2018. First Am. Compl. ¶ 98. That event led to a detailed public statement from then-DPD Chief Renee Hall, a DPD investigation, and a publicized report that found that the shooting was in line with DPD general orders. *Id.* ¶¶ 49, 52. This outcome thereby established a deliberate indifference to the KIP policy likelihood of incurring constitutional violations or Chief

Hall's single decision to adopt an unconstitutional policy. These facts pled together provide context for what would come next. With protesters present in Downtown Dallas for several days' worth of events, the City already had a policy and/or custom in place of using KIPs on peaceful protests, and in at least four instances, as Monacelli alleges, officers carried out the policy, injuring himself as well as Jantzen Verastique, *Id.* ¶ 54, Vincent Doyle, *Id.* ¶ 59, and Ryan Michalesko, *Id.* ¶¶ 30, 30 n.6, 62. The practice eventually resulted in a temporary injunction prohibiting all Dallas police officers from using pepper balls and other KIPs on crowds. *Id.* ¶ 56.

Additionally, Chief Hall admitted that KIP policy and General Orders at the time of the protests had a strong likelihood of incurring constitutional violations. In the Dallas Police Department's After-Action Report on the protests, the police department stated:

> During a review of the use of force and through the recognition that existing General Orders were vague on the deployment of less-than-lethal projectiles during crowd control incidents, General Orders 902.02 and 908.04 were created to ensure Pepperball launchers and 40mm Less Lethal "Stingers" are not deployed into crowds in the future.[1]

Further, Chief Hall subsequently issued a general order "revamping the [Dallas Police Department's] protocols and procedures," on the use of KIPs during protests.[2]

The KIP-related incidents before the protests, Chief Hall's statements regarding the KIP-related incidents before the protests, the KIP incidents during the protests, the After-Action Report, and Chief Hall's subsequent general orders significantly changing KIP policies demonstrate that DPD had a KIP policy in place during the Dallas George Floyd protests in 2020, or that Chief Hall was deliberately indifferent to the likelihood of constitutional violations from her endorsement of

---

[1] City of Dallas, *George Floyd Protests After Action Report* 26 (Aug. 14, 2020), *available at* https://cityofdallas.legistar.com/LegislationDetail.aspx?ID=4615948&GUID=34D7F45C-AF25-4C76-B2A5-84E382DBF34B&Options=&Search=

[2] Ken Kalthoff, *Dallas Police Release Revamped Policy on Use of Force Against Protestors*, NBC DFW, https://www.nbcdfw.com/news/local/dallas-police-release-revamped-policy-on-use-of-force-against-protesters/2411543/ (July 22, 2020, 9:10 PM).

KIPs before the protests. Monacelli has sufficiently alleged a pattern of conduct or a single instance exception with more than the "minimum factual allegations" necessary to show a municipal custom at this stage of the case. *See Gallaher*, 2018 WL 700252, at *3. Collectively, Monacelli has alleged *at least* four factually-similar incidents over a "significantly short[] period of [two days]," *Louzi*, 2020 WL 5040436, at *5, coming after a highly publicized incident involving officers shooting KIPs at marching protesters two years earlier. This Court should consider those facts and find that Monacelli sufficiently alleged Defendants' custom to use KIPs in an unconstitutional manner so as to overcome the City's Motion to Dismiss.

The City urges the Court not to credit the City's responses after its officer fired pepper balls at the peaceful Botham Jean demonstration in 2018. Mot. to Dismiss 10. Chief Hall's statement and the DPD report on the officer's conduct should clearly factor into the analysis of whether Monacelli has plausibly demonstrated an unwritten policy or custom of excessive force via KIPs or if those statements bear on the City's liability for more recent KIP incidents like Monacelli's.

The City relies on *Peterson*, where the Fifth Circuit rejected a theory of liability based on ratification in all but "extreme factual situations." *Peterson*, 588 F.3d at 851. In that case, a plaintiff sued a municipality—but not a police officer—after the officer allegedly applied excessive force to a plaintiff during an arrest in the form of a knee strike to the thigh. *Id.* at 843–44. The chief of police would later issue a determination that the officer had "complied with the department's policies" during the arrest. *Id.* at 848. The plaintiff alleged that the determination made the city liable for his injuries under a ratification theory. *Id*. The Fifth Circuit noted that "our precedent has limited the theory of ratification to 'extreme factual situations.'" *Id.* (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)). The Fifth Circuit simply held that when a city or policymaker

defends a line employee who engages in potentially unlawful behavior, that statement usually will not create independent liability for the city. *Id.*

However, Monacelli's allegations and the facts of *Peterson* are clearly distinguishable. Monacelli does not seek to hold the City liable for the 2018 Botham Jean protest shooting. Rather, he asserts that the 2018 incident, the statement from Chief Hall, and the DPD report all point to a City policy allowing for KIPs to be used during demonstrations and collectively make it more plausible that similar uses of KIPs two years later, including his own shooting, were not isolated mistakes but rather officers following policy. First Am. Compl. ¶¶ 49, 52. *Peterson* does not foreclose a court from considering allegations that provide this type of "context that would show a pattern of establishing a municipal policy," or show a single-incident exception. *Peterson*, 588 F.3d at 851.

### 2. Monacelli sufficiently pled a policymaker with actual or constructive knowledge acted with indifference.

The Fifth Circuit has held that "[c]ourts should not grant motions to dismiss [in § 1983 cases] for failing to plead the specific identity of the policymaker." *Groden v. City of Dallas*, 826 F.3d 280, 285 (5th Cir. 2016) (citing *Johnson v. City of Shelby*, 572 U.S. 10, 11 (2014)). A § 1983 plaintiff need only "plead sufficient facts to allow the court to reasonably infer that the [policymaker] either adopted a policy that caused [the plaintiff's] injury or delegated to a subordinate officer the authority to adopt such a policy." *Hughes v. City of Dallas*, 2020 WL 4670659, at *4 (N.D. Tex. Aug. 11, 2020).

Further, "the Supreme Court has repeatedly emphasized that the identity of the policymaker is a question of law, not fact[,]" and therefore, courts should not dismiss § 1983 claims for failing to allege a specific policymaker. *Groden*, 826 F.3d at 284; *see also Peña v. City of Rio Grande City,* 879 F.3d 613, 622–23 (5th Cir. 2018) (stating that the identity of the policymaker is a legal question and

courts should not grant dismissal for failing to identify). Identification of an official and final policymaker is a question of state and local law. *See Garza*, 922 F.3d at 637.

The City argues the Plaintiff did not sufficiently show a policymaker was deliberately indifferent to a known or obvious risk that alleged customs would result in deprivations of constitutional rights. Mot. to Dismiss 18–19; First Am. Compl. ¶ 97–100. In support of this argument, the City refers to "City Policymakers," but fails to name the identity of the indeterminate policymakers who control the DPD. *See* Mot. to Dismiss 13–14. However, Plaintiff has pled that the City operates and controls the DPD. First Am. Compl. ¶ 13. Further, Plaintiff's pleadings established that former DPD Chief Renee Hall was the City's official and final policymaker in control of DPD. *See id.* ¶¶ 47–49.

For a § 1983 claim against a city, an official policymaker is "one who takes the place of the governing body in a designated area of city administration." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Specifically, the official policymaker must "decide the goals for a particular city function and devise the means of achieving those goals." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)).

A city official, such as former DPD Chief Renee Hall, can be delegated with official policymaking authority by a city's governing body through (1) express statement or formal action or (2) practices or conduct that encourage or acknowledge the city official in a policymaking role. *See id.* Further, the "nature of administrative oversight" by a city's governing body is important in determining official policymaker status as a city official can be an official policymaker even "if a separate governing body retains some powers." *Id.* at 168. (citing *Bennett*, 728 F.2d at 769).

Additionally, a city official does not need power of the purse or final legal control over its conduct in order to be an official policymaker. *Id.*

As a result, a court's review of administrative oversight must be precise and look past the "mere existence of oversight*." Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001). Specifically, a court must review if the administrative oversight directly pertained to the city official's area of authority in question. *Id.*

Further, the Fifth Circuit has specifically held that for a city like Dallas, a chief that establishes internal police policy and procedures through general orders is the City's official policymaking authority for purposes of municipal liability under § 1983. *See Zarnow*, 614 F.3d at 167–69. In *Zarnow*, the Fifth Circuit reviewed whether a police chief within a Texas Home-Rule Charter City was the official policymaker for the City's police department. *Id.* The defendant argued that Article 12 of their city charter stated that the City Manager and City Council had authority over the police department, and thus were the official policymakers. *Id.*

However, the Fifth Circuit rejected this argument based on specific review of the City Council's and City Manger's administrative oversight of the police department. *Id.* Ultimately, the Fifth Circuit held that, absent substantial involvement by the City Council in internal police procedure, the Police Chief's General Orders established the Police Chief as "the sole official responsible for internal police policy." *Id.* As a result, the "City impliedly delegated its policymaking authority to the chief of police." *See id.*

The Fifth Circuit and this Court have subsequently reaffirmed that a Texas Police Chief is impliedly delegated final and official policymaking authority for a Texas city. *See Hobart v. Estrada*, 582 F. App'x 348, 356 (5th Cir. 2014) (holding that policies created by a Police Chief in General Orders are the written guidelines of the department which contain all polices, thereby

grating the Police Chief delegated policymaking authority); *see also Robinson v. City of Garland*, 2016 WL 7396048, at *9 (N.D. Tex. 2016) (holding that while the Police Chief was subject to the authority of the City Manager and City Council,  the Police Chief's ability to enter General Orders and to set police policy were sufficient to establish the Police Chief as the final policymaker for the City Police Department). As a result, "**Texas police chiefs are final policymakers for their municipalities**." *Garza,* 922 F.3d at 637 (5th Cir. 2019) (emphasis added).

This Court has previously held that a Police Chief of the City is not the final and official policymaker for the City. *See Pinedo v. City of Dallas,* 2015 WL 221085, at *6 (N.D. Tex. 2015). The holding in *Pinedo* **exclusively** relies on the terms of the Dallas City Charter to state that the Dallas Police Chief is not the final policymaker for DPD. *See id.* Specifically, *Pinedo* relies on the term in Article 12 of the Dallas City Charter that states that the Chief of Police is "subject to the supervision of the city manager." *See id.*

However, a closer look at the Dallas City Charter and the holding in *Zarnow* demonstrates that the holding in *Pinedo* is either incorrect or incomplete. Dallas has an almost identical Article 12 of its Charter as the city in *Zarnow*.[3] The *Zarnow* city's Article 12 of its Charter reads:

> The police department shall be under the direction of a chief of police, who shall be appointed by the city manager and who, **subject to the supervision of the city manager** and to such rules regulations and orders prescribed by the city manager not inconsistent with the City Charter and ordinances, shall have immediate control and direction of such department.

*Zarnow*, 614 F.3d at 168 (emphasis added)*.* Similarly, Article 12 of Dallas's Charter reads:

> The chief of police shall have immediate direction and control of the police department, **subject to the supervision of the city manager**, and also subject to such rules, regulations, and orders as the city manager may prescribe, not

_____

[3]     Dallas,         Texas,         Municipal         Charter,         Ch.     12,     §     2,     *available     at* https://codelibrary.amlegal.com/codes/dallas/latest/dallas_tx/0-0-0-50319#JD_Chtr.Ch.XII

inconsistent with the ordinances of the city, and shall promulgate all orders, rules, and regulations for government of the police force.[4]

While the order of the terms is different, the exact terms and meaning are identical between the city in *Zarnow* and the City of Dallas. As a result, the Fifth Circuit has expressly held that the terms "subject to the supervision of the city manager" do not automatically deprive a Texas Police Chief, such as the Dallas Chief of Police, of being the final and official policymaker for their City Police Department. *Zarnow*, 614 F.3d at 169. Therefore, this Court must not rely on *Pinedo* and look past the "mere existence of oversight*." Beattie,* 254 F.3d at 603.

A closer examination of the City reveals that former Chief Hall dictated police policy through General Orders as "the Chief of Police will approve General Orders to establish departmental policy or procedures." Specifically, Chief Hall dictated internal policy for the usage of KIPs within the General Order in place during the 2018 and 2020 incidents cited by Monacelli. First Am. Compl. ¶ 49–50, 50 n.16. Chief Hall's power to dictate policy in the sphere of KIPs is demonstrated through her issuance of the "updated general order immediately revamping the department's protocols and procedures" for KIPs after Plaintiff suffered constitutional violations.[5]

Additionally, Defendant's City Manager appeared not to have been substantially involved in internal police procedure in this area of authority when Plaintiff suffered constitutional violations. The City Manager became substantially more involved after, and as a result of, Plaintiff's and other similarly situated individuals' constitutional rights having been violated.[6] As a result, a review of Defendant's administrative oversight over the area of police policy on KIPs demonstrates that Defendant impliedly delegated Chief Hall with policymaking authority here.

---

[4] *Id.*
[5] *Dallas Chief Revamps Police Protocols for First Amendment Activity*, DPD BEAT (July 22, 2020), *available at* https://dpdbeat.com/2020/07/22/dallas-chief-revamps-police-protocols-for-first-amendment-activity/
[6] City of Dallas, *One Dallas: R.E.A.L. Change (Restore Trust and Build Relationships in Policing)* (June 4, 2020), *available at* https://www.dallascitynews.net/wp-content/uploads/2020/06/One-Dallas-REAL-Change_Memo_060420.pdf

Additionally, a plaintiff can show an official policymaker was deliberately indifferent to a known or obvious risk by showing the official policymaker had actual or constructive knowledge of the policy at issue. This knowledge can be demonstrated through either direct supervisory or policy authority. *Actual knowledge* may be sufficiently pled by reference to "discussions at council meetings or receipt of written information" about the policy, while

> *[c]onstructive knowledge* may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (emphasis added).

Several different DPD officers committed similar constitutional violations in temporal proximity, providing a reasonable inference that Chief Hall created or acted deliberately indifferent to the policy allowing officers to shoot pepper balls and other KIPs at protestors, as Monacelli has shown. First Am. Compl. ¶¶ 54, 56, 59. Additionally, after the 2018 Botham Jean protest, Chief Hall gave public comments about the pepper ball incident and DPD issued a report, the results of which were covered by the media; it concluded that the officer's use of KIPs to stop the marching protesters was "consistent" with DPD general orders, thereby demonstrating actual knowledge consistent with endorsement or deliberate indifference of the unconstitutional policy. *Id.* ¶¶ 49, 52. Further, Chief Hall demonstrated actual knowledge of the unconstitutional policy shortly after the relevant events in 2020 when she issued a General Order that stated, "pepper ball or foam kinetic impact projectiles will no longer be deployed into crowds."[7]

### 3. Monacelli sufficiently alleged the City's KIP policy was the "moving force" behind the Fourth Amendment violation.

---

[7] *Dallas Chief Revamps Police Protocols for First Amendment Activity*, DPD BEAT (July 22, 2020), *available at* https://dpdbeat.com/2020/07/22/dallas-chief-revamps-police-protocols-for-first-amendment-activity/

Regarding Monacelli's Fourth Amendment claim, he alleged that Chief Hall had a policy going back at least to 2018 for the use of KIPs, as was described by Chief Hall after a DPD officer shot pepper balls at a peaceful march following the death of Botham Jean. First Am. Compl. ¶ 49. Monacelli further alleged that Defendant ratified the policy when DPD issued a report stating that the officer's use of KIPs to stop a peaceful march was "consistent" with DPD general orders. *Id.* ¶¶ 49, 52, 99, 100. In 2020, DPD officers used KIPs on Monacelli and others covering or participating in protests in similar fashion. As previously stated, Chief Hall recognized that this policy was the moving force behind Monacelli's constitutional violations and immediately "updated general order[s] immediately revamping the department's protocols and procedures" regarding KIPS. Had DPD been previously enjoined from using KIPs in crowd-control situations, as it was shortly after the George Floyd protests, or had Chief Hall not been deliberately indifferent to the likelihood of constitutional violations, Monacelli would not have suffered a physical injury while attempting to gather news. *Id.* ¶ 56.

**4. Monacelli sufficiently alleged his failure-to-train claim regarding the City's lack of training its officers in the First Amendment right to photograph and film in public.**

To state a *Monell* claim for failure to train, Monacelli must plead that "(1) [the municipality's] training policy procedures were inadequate, (2) [the municipality] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused [the constitutional violation]." *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 484 (5th Cir. 2014).

A city's failure to train employees can result in deliberate indifference in two ways:

First . . . , deliberate indifference generally requires notice of a pattern of similar violations at the time the plaintiff's own rights were violated. . . . Second, . . . when a constitutional violation results as the highly predictable consequence of a failure to train, the failure to train can amount to deliberate indifference.

*Robles v. Ciarletta*, 797 F. App'x 821, 833–34 (5th Cir. 2019).

Under this standard, Monacelli has properly pleaded facts showing a failure to train officers on credentialing requirements for journalists, resulting in the City's constitutional violation. The Complaint pleads (1) the pattern of similar violations resulting in deliberate indifference and (2) the highly predictable consequence of that failure to train—specifically, those DPD officers impeding and obstructing journalists from informing the public about protests like those in response to George Floyd's death.

      i.     **Monacelli sufficiently pled officers were inadequately trained as to the First Amendment right to film in public and as a result caused his injuries.**

DPD officers initially rounded up and arrested Monacelli along with hundreds of other people on the Bridge, including protesters, politicians, and several journalists. First Am. Compl. ¶ 22.  Subsequent refusals by DPD officers to review Monacelli's emails or speak to his editor made clear that they were not adequately trained on either DPD's written policy regarding press credentials or the First Amendment right to record police interactions with protesters in a public setting. Monacelli alleges this lack of training was the cause of his prolonged arrest during the protest and, as a result, the reason he was unable to exercise his right to record in public or file any footage or articles with The Voice on his standard deadline. *Id.* ¶¶ 105, 106. Had Monacelli asked only one officer for permission to resume his reporting, a one-off refusal to verify his press credentials might be easily accredited to an isolated incident.

However, Monacelli, desperate to complete his assignment, asked numerous officers in his vicinity to review his credentials and allow him to work and to film the interactions between police and protesters but was continuously met with numerous refusals. ¶¶ 33–40. These refusals meant he could not carry on exercising this right, which is clearly established within the Fifth Circuit. *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) ("We concluded that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment

right to record the police does exist, subject only to reasonable time, place, and manner restrictions."). As a result, DPD training around this First Amendment right, particularly as it is exercised by newspersons, is inadequate.

> ### ii. Monacelli has sufficiently pled a pattern of violations establishing the City's deliberate indifference in failing to train with regard to a policy.

Monacelli has properly alleged a "pattern of similar violations at the time [his] own rights were violated." *Robles v. Ciarletta*, 797 F. App'x 821, 833 (5th Cir. 2019). It is important to note that these violations do not need to match exactly to establish a pattern; they only need to be fairly similar. *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) ("While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired.").

Monacelli has alleged other "fairly similar" violations. For example, the Complaint alleges the unlawful arrest and detention of a photographer who, a day before Monacelli's arrest, was arrested after photographing a DPD officer shoot a protester in the chest with a pepper ball. First Am. Compl. ¶ 54. Monacelli also alleges KIP shootings of two other photographers who were exercising their right to record under the First Amendment when each was shot with KIPs. *Id*. ¶¶ 30, 59.  In all three incidents, DPD officers obstructed individuals from documenting newsworthy protests with the effect of chilling speech on the subject of social justice. *Id.* By pleading these facts, Monacelli has established a "pattern of similar violations" under *Robles*. 797 F. App'x at 833.

Monacelli has also properly alleged that this constitutional violation was a "highly predictable consequence of a failure to train," which makes the City deliberately indifferent, even upon this one occasion. *Id.*

This specific instance arose because of Defendant's failure to train on the "First Amendment right to photograph and video." First Am. Compl. ¶ 106. At the time of Monacelli's detention, the City had "a policy to 'not restrict movement of newspersons, unless their actions clearly and directly interfere with police operations or investigations'"—this policy was ignored by numerous officers who interacted with Monacelli. Id. ¶ 104. Monacelli wore the word "PRESS" prominently on his clothing and repeatedly offered to show officers his credentials, but they refused to engage; thus, Monacelli's movements were severely restricted and his rights violated. Id. ¶ 105. This unconstitutional detention of Monacelli was a "highly predictable consequence" of Defendant's failure to train on its own policies relating to the First Amendment rights of citizens and journalists, because any freelance journalist that does not meet the police officer's subjective identification requirement could be detained.

Additionally, former Chief Hall's After-Action Report, made shortly after the constitutional violations at the protests, established that the City Police Department had needed significant training to protect First Amendment rights.[8] Specifically, Chief Hall's report indicated that "regular and reoccurring training" was needed for police department officers and that "regular training . . . for deploying a response to large-scale events" was needed for police department commanders.[9] If Defendant had trained DPD officers and commanders on these policies before the relevant events, Monacelli would not have been unconstitutionally detained.

## CONCLUSION

For all these reasons, Monacelli respectfully requests that the Court deny the City's Motion to Dismiss in its entirety or allow Monacelli leave to file a second amended complaint to resolve any

---

[8] See City of Dallas, George Floyd Protests After Action Report 45 (Aug. 14, 2020), available at https://cityofdallas.legistar.com/LegislationDetail.aspx?ID=4615948&GUID=34D7F45C-AF25-4C76-B2A5-84E382DBF34B&Options=&Search=.

[9] Id. at p. 41.

deficiencies in the complaint. Rule 15(a) of the Federal Rules of Civil Procedure evinces a bias in favor

of amendment and requires that leave be granted "freely." *Chitimacha Tribe of La. v. Harry L. Laws*

*Co., Inc.,* 690 F.2d 1157, 1162 (5th Cir.1982) (citing FED. R. CIV. P. 15(a)). Leave to amend **should**

**not** be denied unless there is a substantial reason to do so. *Jacobsen v. Osbourne*, 133 F.3d 315, 318

(5th Cir.1998) (emphasis added) (internal quotation marks omitted).

Dated: Dec. 27, 2021.

Respectfully submitted,

By: */S/ Michael W. Shapiro*
    Michael W. Shapiro
    Texas Bar No. 24120472
    SMU DEDMAN SCHOOL OF LAW
    FIRST AMENDMENT CLINIC
    P.O. Box 750116
    Dallas, Texas 75275
    Tel.: (214) 768-4077
    Fax: (214) 768-1611
    Email: mshapiro@smu.edu

By: */S/ David W. Henderson*
    David W. Henderson
    Texas State Bar No. 24032292
    dhenderson@equalrights.law
    **ELLWANGER LAW LLLP**
    400 S. Zang Blvd. Ste. 1015
    Dallas, TX 75208
    Telephone: (469) 998-6775
    Facsimile: (469) 998-6775

    ***Counsel for Steven M. Monacelli***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of December 2021, a true and correct copy of the foregoing document was served via electronic mail to all counsel of record.

<u>*/S/ Michael W. Shapiro*</u>
Michael W. Shapiro