## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **STEVEN M. MONACELLI,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:21-cv-2649** |
| **CITY OF DALLAS, and OFFICERS** | § | |
| **JOHN DOE 1-4, individually and in** | § | |
| **their official capacities as Dallas Police** | § | **JURY TRIAL DEMANDED** |
| **Department Police Officers,** | § | |
| | § | |
| *Defendants*. | | |

## PLAINTIFF'S SECOND AMENDED  COMPLAINT

Plaintiff STEVEN MONACELLI ("Plaintiff") files this Second Amended Complaint pursuant to the Court's Order (Dkt. No. 23) for damages and all other legal and equitable relief from the CITY OF DALLAS, TEXAS ("City Defendant") and JOHN DOE POLICE OFFICERS 1-4 ("John Doe Defendants") for violations of Plaintiff's rights under the U.S. Constitution, including protections against deprivations of the First Amendment, protections against excessive force under the Fourth Amendment, protections against unlawful arrest under the Fourth Amendment, failures to discipline in violation, and failures to adopt policies or train, and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1.      This is an action brought by Plaintiff against Defendants for acts of unlawful arrest, excessive force, inadequate training, and failures to adopt policies that led Plaintiff to suffer emotional harms, bodily injuries, and constitutional deprivations. Defendants brought such action under the color of law in violation of individual rights under the First and Fourth Amendments of the United States Constitution, and is actionable under 42 U.S.C § 1983 for the violation of such civil rights.

2.      In the summer of 2020, protests erupted in major cities across the nation after George Floyd's murder in Minneapolis. Plaintiff, and a cameraman, were on assignment for the Dallas Voice covering protests in Dallas, Texas. During this coverage, Plaintiff used his cell phone to film a large group of protesters that marched from downtown and eventually onto the Margaret Hunt Hill Bridge (the "Bridge")—a demonstration meant to shine a spotlight on abuses of power by police departments across the country and racial inequality.

3.      While reporting on the protests, the John Doe Defendants from the Dallas Police Department ("DPD") fired a kinetic impact projectile ("KIP") directly at Plaintiff. The KIP struck Plaintiff in the leg and caused significant injuries.

4.      Plaintiff immediately recoiled in pain but was still able to offer the John Doe Defendants proof of his press credentials. But rather than offering Plaintiff aid and assistance for his injuries, the John Doe Defendants ignored Plaintiff's credentials. The John Doe Defendants then unlawfully arrested and zip-tied Plaintiff. The John Doe Defendants held Plaintiff in custody and prevented him from covering the protests against police misconduct any further.

5.      The City Defendant's unconstitutional official policies; and the failures of the City Defendant to adopt policies and/or conduct training to ensure its officers avoided the likely deprivation of the constitutional rights afforded to civilians and journalists—particularly those exercising their First Amendment rights to engage in newsgathering activities, were the moving force behind Plaintiff's injuries.

6.      As a result of the Defendants' unlawful conduct, Plaintiff is entitled to injunctive relief and the recovery for damages pursuant to deprivation of rights under the United States Constitution including protections against deprivations of the First Amendment, protections against excessive force under the Fourth Amendment, protections against unlawful arrest under the Fourth Amendment, failures to discipline, failures to adopt policies or train, and any other cause(s) of action that can be inferred from the facts set forth herein.

**JURISDICTION & VENUE**

7.      This Court has jurisdiction over this action pursuant to: (i) 28 U.S.C.A § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States; (ii)  28 U.S.C.A § 1343(a)(3), which confers original jurisdiction upon this Court in any civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and 28 U.S.C.A § 1343(a)(4), which confers original jurisdiction upon this Court in any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

8.      The Court's supplemental jurisdiction is invoked by 28 U.S.C.A § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Venue is proper in this Court under 28 U.S.C.A § 1391(b)(1) because Defendant is a municipality within the State of Texas and resides in this judicial district; and under 28 U.S.C.A § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

10.      Steven M. Monacelli is a Texas resident and a journalist. He currently resides in Dallas. Monacelli is editor and publisher of Protean Magazine, an online and print literary magazine he founded in 2018. He has also freelanced for numerous local and national publications including *The Daily Beast, Dallas Observer, D Magazine, Eater Dallas, Dallas Weekly, Dallas Free Press, Fort Worth Weekly, Central Track, Byline Times*, and *Frisco Style*. Mr. Monacelli was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020; and

is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

11.     The City of Dallas is a local governing municipality empowered and incorporated as a home-rule municipality under the Texas Constitution and the Texas Local Government Code;[1] and is located in Dallas, County, Texas. The City of Dallas, as a home-rule municipality under Texas law, operates lawfully under the Charter of the City of Dallas ("City Defendant's Charter").[2] The City of Dallas self-governs through Defendant's Charter and through the Dallas City Code ("City Defendant's Code").[3] The City of Dallas - City Council ("Defendant's City Council") possesses the power, "[e]xcept as otherwise provided by [City Defendant's Charter],"[4] to establish the "official actions [of the City of Dallas] by written ordinances, resolutions, or oral motions."[5] The written ordinances ("City Defendant's Code") operate as the official policies and procedures of the City of Dallas, expressly "ORDAINED" by Defendant's City Council.[6] The City of Dallas is within the Northern District of Texas, Dallas Division.

---

[1] *See* Charter of the City of Dallas, TEX. CH. II § 2 ([Defendant] shall have and exercise all powers conferred upon cities by what is known as the Home Rule Amendment to the Constitution of the State of Texas and the Enabling Act relative thereto[.]") (Available at https://codelibrary.amlegal.com/codes/dallas/latest/dallas_tx/0-0-0-49893); *see also* TEX. CONST. ART. XI, § 5; TEX. LOCAL GOV'T CODE § 9; TEX. LOCAL GOV'T CODE § 26.

[2] *See ESI/Employee Solutions, L.P. v. City of Dallas*, 531 F.Supp.3d 1181, 1191 (E.D. Tex. 2021) ("Home-rule cities are those operating under a municipal charter as provided for in the Texas Constitution.") (quoting *Barnett v. City of Plainview*, 848 S.W.2d 334, 337 (Tex. App.—Amarillo 1993, no pet.); TEX. CONST. ART. XI, § 5.).

[3] *See Id.* at 1191 ("Home-rule cities, like the City of Dallas, 'possess the power of self-government.'") (quoting *BCCA Appeal Grp. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016)); *see also* CH. XVIII § 1; Dallas City Code, CH. 1.

[4] Charter of the City of Dallas, Tex. CH. III § 1.

[5] *Id.* at CH. XVIII § 1.

[6] *See* Dallas City Code, CH. 1; *see also* Charter of the City of Dallas, Tex. at CH. XVIII § 2.

12.      Officer John Doe One is a law enforcement officer with the City of Dallas and is sued in his individual and official capacity. At all relevant times, Officer John Doe One was acting under the color of law as a law enforcement officer in coordination with the other John Doe Defendants as City of Dallas police officers.

13.      Officer John Doe Two is a law enforcement officer with the City of Dallas and is sued in his individual and official capacity. At all relevant times, Officer John Doe One was acting under the color of law as a law enforcement officer in coordination with the other John Doe Defendants as City of Dallas police officers.

14.      Officer John Doe Three is a law enforcement officer with the City of Dallas and is sued in his individual and official capacity. At all relevant times, Officer John Doe One was acting under the color of law as a law enforcement officer in coordination with the other John Doe Defendants as City of Dallas police officers.

15.      Officer John Doe Four is a law enforcement officer with the City of Dallas and is sued in his individual and official capacity. At all relevant times, Officer John Doe One was acting under the color of law as a law enforcement officer in coordination with the other John Doe Defendants as City of Dallas police officers.

## STATEMENT OF FACTS

**A. On June 1, 2020, DPD operated under Delegated Policymaker, Dallas Chief of Police Renee Hall**

16.      As a home-rule municipality under Texas law, the City Defendant holds all authority to establish the DPD through the City Defendant's Charter and the City Defendant's Code.[7] The City Defendant is bound by the City Defendant's Charter as it relates to the establishment and operations

---

[7] *Johnson v. Rosenberg Police Dep't*, 2019 WL 3892331, at *2 (S.D. Tex. 2019) ("As a home-rule municipality, [a home-rule city] has the authority to establish its own police force.") (citing TEX. LOCAL GOV'T CODE § 341.003)

of the DPD.

17.     Under the City Defendant's Charter, the City Defendant funds and operates the DPD through the direction of the Dallas Police Department Chief of Police ("DPD Chief");[8] and delegates that the DPD Chief "shall have immediate direction and control of the [DPD]…and shall promulgate all orders, rules, and regulations for government of the [DPD]."[9]

18.     Under the City Defendant's Code, the DPD Chief is delegated with the final authority to "assign each [DPD officer their] round of duty and may order any of them to render service in any ward wherever and whenever, in [the DPD Chief's] opinion, the occasion shall require it."[10]

19.     The City Defendant's Code further expressly defines that the DPD Chief, in the area of law enforcement, <u>shall have the same powers as the sheriff of a county under the laws of the state</u>."[11] Under the well-settled laws of the state of Texas, a sheriff of a county is the recognized final and ultimate policymaking authority in the area of law enforcement for a county municipality. *See Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 448 (5th Cir. 2019) (holding that the final and ultimate policymaking authority for law enforcement for a local County municipality is a Texas County

---

[8] *See* Charter of the City of Dallas, Tex. Ch. XII § 1 (Defendant's Charter expressly designates the DPD Chief as the Head of the DPD).

[9] *Id.* at Ch. XII § 2(1). The City Defendant's Charter establishes that the DPD Chief's direction and control of the DPD is "subject to the supervision of the city manager, and also subject to such rules, regulations, and orders as the city manager may prescribe[.]" *Id.* at Ch. XII § 2(1). However, the City Defendant's Charter expressly restricts the city manager's "supervision" of the DPD Chief by the terms of Defendant's Code. *Id.* at Ch. XII § 2(1) ("[N]ot inconsistent with the ordinances of the city[.]). Nor does the City Defendant's Charter provide the city manager with power over the governance of the DPD, or the promulgation of DPD orders, rules, and regulations. *See id.*

[10] Dallas City Code, Ch. 37, Art. II § 37-4 (The City Defendant's Code does not provide the city manager with authority over the assignment of DPD officers, and rather restricts the city manager's authority to written reports of the actual time served by DPD officers).

[11] *Id.* (Notably, the City Defendant's Code does not include any restriction on this express delegation of authority to the DPD Chief in the area of law enforcement).

Sheriff); *see also Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir.1990) (holding that a Texas Sheriff is the final policymaker for a County over law enforcement operations, procedures, policies, and training); *Gipson v. Harris County, Tex.*, 2020 WL 6550542 at *3 (S.D. Tex. Oct. 15, 2020) (quoting *Harris Cty. v. Coats*, 2020 WL 581184, at *6 (Tex. App.—Houston [14th Dist.] Feb. 6, 2020, n.p.h.) (stating that a Texas Sheriff is the final policy maker for a County in the area of law enforcement for purposes of County liability under § 1983). As a result, the City Defendant's Code, as ordained by Defendant's City Council, expressly delegates the DPD Chief with official policymaking authority in the area of law enforcement, and thus, expressly delegates the DPD Chief with official policymaking authority for the DPD.[12]

20.     Ultimately, the City Defendant's Code expressly delegates the DPD Chief with the official authority to "oversee the administration of the [DPD] in accordance with [the City Defendant's Charter]."[13] Therefore, the City Defendant expressly delegates the DPD Chief with official authority to decide the goals of the DPD in law enforcement and to control, establish, operate, regulate, and promulgate all official policies for achieving those goals.

21.     Throughout the history of the DPD, the DPD Chief has controlled, established, operated, and regulated the DPD through the promulgation of the DPD General Orders. As stated in DPD General Order 202.01, the DPD Chief holds final approval over the DPD General Orders in order to establish "[d]epartmental policy or procedures[,] [p]olicy or procedures affecting two or

---

[12] As previously outlined, the city manager's "supervision" of the DPD Chief must not be inconsistent with Defendant's Code. *See Supra.* at ¶ 14, fn.10. Therefore, under the terms of the City Defendant's Charter and the City Defendant's Code, the city manager does not have authority over the DPD Chief in the area of law enforcement as it relates to the DPD. In fact, the City Defendant's Code expressly states that the DPD Chief only needs to execute the orders of the city manager "as far as practicable[.]" Dallas City Code, CH. 37, ART. I § 37-4.

[13] *Id.* at CH. 37, ART. III § 37-38.2.

more bureaus[, and] [s]pecific responsibilities and/or duties."[14] In fact, the City Defendant's Code, as ordained by Defendant's City Council, expressly recognizes that the DPD Chief utilizes the DPD General Orders in order to set the policies for the DPD.[15]

22.     In addition, the DPD Chief has continually been publicly recognized as the City Defendant's official policymaker for DPD policies as implemented in the DPD General Orders, DPD practices, and DPD training.

23.     In fact, numerous public news reports over the years have detailed the policymaking authority of DPD Chiefs towards changes in DPD policy, practices, and training.

24.     In August 2012, DPD Chief David Brown publicly announced eight different reforms to DPD policies that would be reflected in the DPD General Orders, practices, and training.[16] The reforms included changes to investigative processes, changes to reporting processes, the development of a formalized DPD foot pursuit policy, re-implementing a DPD video review policy, and implementing training for the use of less-than-lethal electronic control weapons.

25.     On July 8, 2016, a national news report from the Washington Post further recognized that DPD Chief Brown "has implemented a host of policies" for the DPD.[17]  The report detailed that the former DPD Chief was responsible for reforms to the DPD's lethal force policies and training

---

[14] All DPD General Orders incorporated and referenced in Plaintiff's First Amended Complaint were in place at the time of Plaintiff's injuries caused by Defendants.

[15] Dallas City Code, at CH. 37, ART. III § 37-38.2. ("The chief shall promulgate general orders and standard operating procedures in compliance with this article. The chief has discretion in how and whether to implement changes recommended by the board.")

[16] Eric Nicholson, *Dallas Police Chief Announces Policy Shifts After Fallout from James Harper Shooting*, DALLAS OBSERVER, (Aug. 10, 2012), https://www.dallasobserver.com/news/dallas-police-chief-announces-policy-shifts-after-fallout-from-james-harper-shooting-7133678

[17] Radley Balko, *What the Dallas Police Department does right — and why doing those things could now be more difficult*, THE WASHINGTON POST, (July 8, 2016), https://www.washingtonpost.com/news/the-watch/wp/2016/07/08/what-dallas-pd-does-right-and-why-doing-those-things-could-now-be-more-difficult/

programs. The policy changes also included explicit terms that controlled whether DPD officers were allowed to use certain types of force on the job.

26.     Additionally, the report detailed that DPD Chief Brown "implemented a policy of collecting and releasing data on all use-of-force incident [and] implemented a body camera policy." Lastly, DPD Chief Brown was publicly recognized for changes in the policies for the assignment of DPD officers throughout the City Defendant.

27.     On December 18, 2017, a news report detailed changes to DPD General Orders led by DPD Chief Renee Hall.[18] These changes to policy controlled the way in which DPD officers were allowed to present themselves to the public.

28.     On June 5, 2020, a national news report from NPR outlined the implementation of a "duty to intervene" policy for DPD officers.[19] DPD Chief Hall was the official policymaking authority and wrote the "duty to intervene" policy into DPD General Order 901.00. The reformed DPD General Order set forth the DPD policy that required DPD officers to act if another officer applied inappropriate force.

29.     On August 23, 2022, a news report detailed changes to DPD General Orders led by DPD Chief Eddie Garcia.[20] Specifically, DPD Chief Garcia was the official policymaking authority responsible for significant changes to DPD General Orders on the use of body cameras.

30.     These reports are only a small selection of numerous instances where DPD Chiefs

---

[18] Dan Solomon, *The Dallas Police Department is the Latest to Allow Officers to Grow Beards*, TEXAS MONTHLY, (Dec. 18, 2017), https://www.texasmonthly.com/the-daily-post/dallas-police-department-beards/

[19] Jason Slotkin, *Dallas Police Adopts 'Duty To Intervene' Policy To Prevent Abuse*, NPR, (June 5, 2020), https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/05/870414038/dallas-police-adopts-duty-to-intervene-policy-to-prevent-abuse

[20] Ryan Osborne, Rebecca Lopez, *Dallas police officers now have to wear body camera on off-duty jobs, chief says*, WFAA, (Aug. 24, 2022), https://www.wfaa.com/article/news/local/dallas-police-department-chief-officers-now-have-to-wear-body-camera-on-off-duty-jobs-chief-says/287-7c715815-d6a7-4d16-85de-187166e9ce54

were publicly recognized for their official policymaking authority towards DPD policies, practices, and procedures. All such policymaking was publicly known and even commented on by Defendant's City Council, yet none of the City Defendant's other actors were involved or reversed the changes to DPD policies made by DPD Chiefs.

31.     Defendant's City Council also has been presented with notice of deficiencies in the DPD General Orders.[21] In 2018, an audit of the DPD found deficiencies in the DPD General Orders regarding off-duty hours worked by DPD officers. A report of the audit's findings was presented to Defendant's City Council and highlighted several areas of reform. Rather than act with policymaking authority for the DPD, Defendant's City Council instead maintained the delegation of policymaking authority to the DPD Chief. As a result, DPD Chief Hall acted to implement changes to DPD's General Orders, and subsequently informed Defendant's City Council of the official policies. In fact, Defendant's City Council had no role in the actual terms of the official policies implemented by DPD Chief Hall.

32.     Therefore, the DPD Chief's policymaking authority exits beyond express delegation as Defendant's City Council has consistently impliedly recognized the official policymaking authority of the DPD Chief as applied to the adoption and promulgation of the DPD General Orders.

33.     In addition, the City Defendant's Charter provides the DPD Chief with "the right to discipline any of the [DPD's] officers or employees who may be under the [DPD Chief]'s jurisdiction for violations of [the City Defendant's Code] or federal or state law, or for failure to obey orders given by the proper authority, or the orders, rules, and regulations promulgated by the [DPD

---

[21] Robert Wilonsky, *Dallas police to drastically cut the number of hours officers can work off-duty jobs*, THE DALLAS MORNING NEWS, (Nov. 12, 2019), https://www.dallasnews.com/news/crime/2019/11/12/dallas-police-to-drastically-cut-the-number-of-hours-officers-can-work-off-duty-jobs/

Chief].”[22] The City Defendant's Charter only allows the DPD's disciplinary decisions to be overturned through an administrative appellate process, rather than any direct oversight by the city manager or other entity of the City Defendant.[23]

34.     The City Defendant's Code, as ordained by Defendant's City Council, expressly states that the DPD Chief has the authority to "issue final disciplinary actions" for the DPD.[24] Therefore, under the City Defendant's Charter and the City Defendant's Code, the DPD Chief is responsible for the acts and omissions of DPD officers based on the DPD Chief's final authority over the discipline of each DPD officer.

### B.  The Events of June 1, 2020

35.     Plaintiff is a freelance journalist and a magazine publisher. He has worked in journalism since 2018 after an earlier career as a consultant and has covered events in the Dallas-Fort Worth area for the Dallas Voice and the Dallas Observer among many other publications.

36.     On June 1, 2020, Plaintiff went downtown to cover protests that erupted in Dallas, as in other cities across the country, after the murder of George Floyd by a former Minneapolis police officer. Plaintiff was on assignment to cover the protests for the Dallas Voice.

37.     The Dallas protests, spanning several days and nights, were largely peaceful. On the night of June 1, protesters marched without incident from the Frank Crowley Courts Building, up Riverfront Boulevard, before being redirected by police officers onto the Margaret Hunt Hill Bridge (the "Bridge"). This peace was interrupted by police officers in the form of so-called "less lethal" rubber bullets, smoke bombs, and tear gas fired into the demonstrators. Video footage from journalists and protesters alike capture this moment and these extreme actions taken by the officers. The protest

---

[22] City of Dallas Charter, at Ch. XII § 4 (Defendant's Charter does not prescribe any discipline for DPD officers for a failure to obey orders, rules, and regulations promulgated by the city manager).

[23] *Id.*

[24] Dallas City Code, at CH. 37, ART. III § 37-38.2.

started at a rally outside the court building.

38.     At around 8:00 p.m., those assembled walked north on Riverfront Boulevard according to press accounts.[25] Upon reaching the base of the Bridge at the intersection of Riverfront Boulevard and Woodall Rogers Freeway, DPD officers blocked the protesters from continuing protests on that road.[26] However, the DPD left the westbound ramp onto the Bridge open and individual officers instructed protesters to "continue moving" in the only direction that was not blocked.

39.     At around 9:00 p.m., protesters walked west across the bridge and Plaintiff, along with other journalists, walked ahead of the crowd so he could document the event on his camera phone.

40.     Plaintiff was one of several journalists who positioned himself at the periphery of the protest. As protesters entered the narrower confines of the Bridge, Plaintiff kept to the shoulder of the road.

41.     After hundreds of protesters marched onto the bridge, a line of DPD officers in riot gear formed and confronted them on the other side while a group of officers pushed protesters in from behind using armored vehicles in a "kettling" maneuver. Caught between these groups of officers were protesters, of course, but also several journalists, including Plaintiff, and a member of Defendant's City Council.

---

[25] Silas Allen, *Kettling Tactic Dallas Police Used Against Protesters is Steeped in Controversy*, DALLAS OBSERVER (June 8, 2020), https://www.dallasobserver.com/news/dallas-police-protesters-kettling-margaret-hunt-hill-bridge-11916828.

[26] Tim Cato, *I was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, D MAGAZINE (June 3, 2020, 3:44 pm), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to- happen/.

42.    When the protesters approached the line of officers at the west end of the bridge, DPD officers launched several canisters containing chemical irritants in their direction. As a result, protesters and journalists near the front of the crowd were exposed to the dangerous effects of tear gas.

43.    As tear gas began to irritate the lungs and eyes of protesters, many started running away toward the east side of the bridge.

44.    Plaintiff was almost immediately exposed to the gas, which forced him to stop filming and flush out his eyes and clear his lungs. Once composed, Plaintiff resumed filming the protesters near the front of the march as they beat a hasty retreat in the opposite direction. This left Plaintiff and at least one other journalist positioned between the protesters and an advancing line of DPD officers. At this point, none of the protestors represented any immediate threat to the officers.

45.    At approximately 9:02 p.m., while Plaintiff panned his camera phone back and forth to capture both the retreating protesters and the advancing officers, officers began firing less than-lethal weapons (KIPs) directly at the crowd and the journalists. Plaintiff witnessed a person who was struck with a KIP and he panned down to see what type of ammunition was used.

46.    As Plaintiff's back was turned to the officers, John Doe Police Officer 1 fired a KIP at Plaintiff's leg, leaving a large, discolored bruise that would leave him limping for several days.

47.     Plaintiff's injury is pictured below.



48.     Seconds later, John Doe Police Officer 2 shot Plaintiff in the back with a paintball, as Plaintiff was staggering away from the officers to tend to his wound. The paintball left a neon green mark on Plaintiff's shirt on the small of his back.

49.     Plaintiff was not the only person, or even the only journalist, shot by DPD officers with less-than-lethal rounds that night. A *Dallas Morning News* staff photographer, who also found himself positioned between the officers and the protesters, was hit in the upper thigh or buttocks with

a less-than-lethal round.[27]

50.     Though Plaintiff was in considerable pain and struggled to walk, he still intended to continue to report the actions of DPD officers that night. However, he was denied the opportunity because DPD officers began arresting people on the bridge, including Plaintiff. This is even though Plaintiff was clearly engaged in First Amendment-protected newsgathering activities at the time, and was clearly not committing any crime.

51.     Plaintiff wore a white helmet with the word "PRESS" in large black lettering to be as conspicuous as possible. He also wrote the word "PRESS" clearly on the straps and back of his backpack and on the front of his shirt. Finally, Plaintiff possessed emails clearly demonstrating that he was currently on assignment, and he was ready to show these emails to any law enforcement officials, if any would look.

52.      Rather than verify his credentials, DPD officers forced Plaintiff to the ground where he was forced to sit for approximately 2 ½ hours.  After about an hour, DPD officers bound Plaintiff's hands behind his back with zip ties.

53.     Throughout the arrest, Plaintiff told officers he was a journalist and offered to demonstrate this through emails from his editor at the Dallas Voice showing he was on assignment. Numerous DPD officers ignored Plaintiff's words, the word "PRESS" displayed conspicuously on his clothing, and the email from his editor.

54.     DPD officers, however, did let certain journalists from various other outlets continue to report on the events, while Plaintiff was forced to continue sitting.

55.     Noticing this, Plaintiff grew frustrated that officers appeared to be picking and choosing which reporters could do their jobs based on something other than whether journalists were

---

[27] Ryan Michaelesko (@photosbylesko), Twitter (June 5,2020), ("Whatever you want to call it: rubber bullet, foam bullet, less-lethal ammunition. I was hit in the rear with this on the bridge Monday night as I was caught between the police line advancing from the west and protesters. It still hurts to sit."). https://twitter.com/photosbylesko/status/1269073413030764544

covering the events professionally. As a result, he made every effort to ask why he was still being detained despite carrying proof that he was a working journalist along with contact information of his editor for any officers who would independently verify his credentials.

56.     John Doe Police Officer 3 (pictured below, left) provided the only substantive response to Plaintiff's questions, and said Plaintiff needed to have "press ID" to be treated as a reporter, even though DPD General Order 323.01 does not require any specific forms of credentials like press badges or laminated passes for journalists covering law enforcement activities in public.



57.     John Doe Police Officer 3 and other officers refused to look at Plaintiff's emails or call his editor at the Voice. Instead, when Plaintiff continued to object to his arrest and point out that he was a member of the press, he was mocked by officers. Plaintiff noticed the DPD officers' wanton disregard for the constitutional rights afforded Plaintiff, and the lack of any response for the injuries Plaintiff experienced.

58.     As officers began zip-tying the hands of the people sitting on the bridge, Plaintiff asked yet again if he could resume his work.

59.     Specifically, Plaintiff told John Doe Police Officer 4 that he was a member of the press and asked why he was being zip tied. John Doe Police Officer 4 ignored that Plaintiff was a member of the press and only replied to say, "You're under arrest."

60.     At around 10:45 p.m., Plaintiff's hands were zip tied behind his back by John Doe Police Officer 4.

61.     Plaintiff was held in this manner for more than an hour, and was not released until around 11:56 p.m.

62.     Plaintiff's detention, in addition to being unconstitutional, was especially hazardous to his health and mental well being because he was kept in close proximity to hundreds of protesters as COVID-19 spread rapidly throughout North Texas, long before a vaccine was widely available.

63.     Plaintiff was also distressed about the injury to his leg. As a result, he asked officers if he could receive medical attention at various times throughout his detention. The John Doe Defendants refused to provide Plaintiff with any medical care.

64.     The arrest and detainment of Plaintiff without probable cause was a direct result of then-existing DPD General Order 609.00; the DPD policy regarding mass arrests.

65.     DPD General Order 609.00 fails to include a requirement that mass arrests are founded upon probable cause, based on specific and articulable facts identifying the arrestee's alleged wrongdoing. Instead, it only requires that arrests be approved by a supervisor from the DPD Patrol Division Investigative Unit.

66.     DPD General Policy 609.00 further allows DPD officers to effectuate arrests based on officer's discretion to "quell a civil unrest incident" rather than based on a sufficient probable cause analysis.

### C.   DPD's Dangerous Policy for the Use of Potentially Deadly Kinetic Impact Projectiles ("KIPs") on Protesters, Bystanders, and Journalists Covering Protests

67.     Though the names of types of KIPs ("rubber", "foam", "bean bag") suggest the ammunition could be safely used on civilian populations at any range, this is not the case. A 2017 study in the medical journal *The BMJ* demonstrates the serious risk to human health from KIP.[28] In the review, which looked at 1,984 people who had been hit by a KIP, the authors found that 53, or 2.7 percent, died from their injuries, while 300, or 15.1 percent, suffered permanent disability as a result.[29]

68.     Given the potential for these types of ammunition to cause lasting physical harm to a significant percentage of people injured by them, the Physicians for Human Rights concluded in 2016 that "KIPs in general are not an appropriate weapon to be used for crowd management and, specifically, for dispersal purposes" and "KIPs should never be fired at close range."[30]

---

[28] Rohini J. Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review*, BMJ OPEN (Dec. 5, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.

[29] *Id.* at p. 1.

[30] Rohini J. Haar & Vincent Iacopino, *Joint Report of the Physicians for Human Rights and International Network of Civil Liberties Organizations, Lethal in Disguise: The Health Consequences of Crowd-Control Weapons*, pp. 93, 94 (March 1 2016).

69.      Indeed, because KIPs "are likely to be inaccurate and indiscriminate" due to their size and shape, an officer firing a KIP as a means of dispersing or subduing an individual protester under extreme conditions (such as a protester engaged in violent acts) may be unable to do so without significant risk of injuring bystanders or journalists nearby.

70.      As a result, law enforcement experts have called for the reduced use of KIPs, judges have ordered cities to stop using KIPs in crowd-control situations, and police departments have limited their use on their own.[31] For example, in the aftermath of the George Floyd protests, Austin's police chief instituted changes to the departments policy on protests, stating and said "the deployment of bean bag ammunition will not be used in a crowd situation."[32]

71.      Yet many cities, including the City Defendant, had ample warning of the dangers posed by KIPs before the 2020 protests. During the September 2018 protests of the death of Botham Jean, a DPD Officer sought to block non-threatening protesters from marching down Cadiz Street by firing multiple rounds of PepperBalls aimed directly at the crowd.[33] The DPD officer who fired PepperBalls stated he was "keep[ing] protesters back" as they sought to turn onto

---

[31] Liz Szabo, Jay Hancock, Kevin, McCoy, Donovan Slack, and Dennis Wagner, *Fractured Skulls, Lost Eyes: Police Break their Own Rules when Shooting Protesters with 'Rubber Bullets'*, USA TODAY & KAISER HEALTH NEWS (June 19, 2020), https://www.usatoday.com/in-depth/news/nation/2020/06/19/police-break-rules-shooting-protesters- rubber-bullets-less-lethal-projectiles/3211421001/.

[32] Russell Falcon, *APD Won't Use Bean Bag Rounds Anymore, Chief Says*, KXAN (June  4,2020),  https://www.kxan.com/austin-george-floyd-mike-ramos-protests/bean-bag-rounds-wont-be-used-by-austin-police- starting-this-week-apd-chief-says/.

[33] Cassandra Jaramillo, *Chief Orders Review After Dallas Cop Caught on Video Shooting Pepper Balls at Botham Jean Protest*, DALLAS MORNING NEWS (Sept. 11, 2018), https://www.dallasnews.com/news/crime/2018/09/11/chief- orders-review-after-dallas-cop-caught-on-video-shooting-pepper-balls-at- botham-jean-protest/.

Cadiz Street, after his hand gestures and voice commands did not work.[34]

72.     The day after the incident, then-DPD Chief Hall publicly acknowledged in a video that she was aware that a DPD officer fired PepperBalls at a crowd of protestors.

73.     Public records obtained by the news media demonstrated that the DPD officer who fired the PepperBall gun had let his official KIP certification lapse by a year and that he also failed to inspect the weapon after it was issued to him for his shift.

74.     The DPD, under the direction of DPD Chief Hall, reviewed the incident and issued a preliminary report. In spite of the officer's lapsed certification and his failure to inspect his weapon after it was issued to him for his shift, the DPD deemed his actions "'consistent' with DPD General Orders.

75.     The DPD's findings were consistent with the then-terms of DPD General Order 902.00. At the time, General Order 902.00 did not include any provisions outlawing or prohibiting officers from firing or deploying direct contact hits into a crowd of protestors. DPD Officers thus followed DPD policies whenever they fired KIPs directly at a crowd.

76.     At the time, DPD Chief Hall had personal knowledge of this major gap in policy as she personally approved a review of the DPD Officer's deployment of the PepperBall gun.[35] DPD Chief Hall also made public comments regarding the terms of DPD General Orders for the use of such less-than-lethal weapons during protests.

77.     Therefore, in 2018, DPD Chief Hall was aware that there was a substantial

---

[34] Cassandra Jaramillo, *Dallas Officer's Pepper-Ball Use During Botham Jean Protest Deemed 'Consistent' with Policy*, DALLAS MORNING NEWS (Dec. 28, 2018), https://www.dallasnews.com/news/2018/12/28/dallas-officers-pepper-ball-use-during-botham-jean-protest-deemed-consistent-with-policy/

[35] *Id.*

likelihood that DPD officers would fire KIPs directly into crowds during large protests. Despite such knowledge, DPD Chief Hall failed to implement any policies to prevent this substantial likelihood from occurring again.

78.    This public endorsement of the use of KIPs by an unqualified officer on non-threatening protesters sent clear messages that were on display less than two years later when officers shot Plaintiff and others during the George Floyd protests the night of June first: (1) DPD General Order 902.00 does not restrict DPD Officers from firing KIPs at crowds of protestors, and (2) a lack of training to maintain proper certification for using KIPs should not deter officers from firing KIPs into crowds of non- violent, non-threatening protesters.

79.    But the June 1st incident which forms the basis of this complaint does not stand as an outlier of Dallas police behavior in the George Floyd protests. Just the night before, a photographer documented a veteran DPD shooting pepper balls in the chest of an unarmed, non-violent protester, Jantzen Verastique. An image of the incident shows DPD Sgt. Roger Rudloff firing the weapon at Verastique at point-blank range before ordering her arrest.[36] Verastique, fellow demonstrators, and the photographer spent a night in jail, but their charges were dropped in mid-June.

80.    DPD reviewed the shooting incident as part of a criminal investigation into Sgt. Rudloff's conduct.[37] However, DPD closed the case in March with a spokesperson telling the

---

[36] Miles Moffeit, Cassandra Jaramillo, and Dianne Solis, *'I Felt Like My Chest Was On Fire': Photo Shows Dallas Police Officer Shooting Proester With Pepper-Ball Gun*, DALLAS MORNING NEWS, (Aug. 9, 2020), https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop- blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/.

[37] Miles Moffeit, Cassandra Jaramillo, and Madi Alexander, *Dallas Police Secretly Dropped Investigation into Officer who Shot Protester with Pepper-Ball Gun*, DALLAS MORNING NEWS, (Sept. 10, 2021), https://www.dallasnews.com/news/investigations/2021/09/10/dallas-police-secretly-dropped-investigation-into- officer-who-shot-protester-with-pepper-ball-gun/

*Dallas Morning News* that "investigators concluded there was no evidence to show the officer committed a crime." In so doing, the City Defendant again sanctioned and ratified the use of KIP against unarmed, non-violent individuals at protests.

81.     In June 2020, United States District Court Judge Sam Lindsay issued a temporary injunction, in response to civil rights lawsuit brought by two black Dallas-area residents, prohibiting DPD's use of "'less lethal' weapons, such as tear gas, smoke bombs, flashbangs, pepper balls, mace, and other chemical agents in connection with protests" against those not posing a threat, along with the "firing or deploying kinetic impact projectiles into a crowd for any purpose."[38] This injunction expired on Nov. 16, 2020.[39]

82.     Before the expiration of the injunction, DPD Chief Hall finally implemented policies restricting the use of KIPs on crowds by implementing changes to DPD General Order 902.00.[40] The policy changes implemented by DPD Chief Hall implemented terms that established that "[f]iring or deploying Direct Contact Hits into a crowd is prohibited." However, the reforms by DPD Chief Hall came too late to prohibit DPD officers from engaging in unconstitutional practices during the George Floyd protests.

---

[38] Veronica Gonzalez, Cassandra Jaramillo, and Hayat Normine, *Federal Judge Temporarily Bans Dallas Police, City From Using Tear Gas, Less-Lethal Ammunition During Protests*, DALLAS MORNING NEWS¸ (Jun. 12, 2020), https://www.dallasnews.com/news/courts/2020/06/12/federal-judge-temporarily-bans-dallas-police-city-from-using- tear-gas-less-lethal-ammunition-during-protests/

[39] *Williams v. City of Dallas*, No. 3:20-cv-01526, Order Extending Agreed Preliminary Injunction (Oct. 14, 2020).

[40] Jozelyn Escobedo, *Chief Reneé Hall issues order limiting police use of tear gas, rubber bullets at protests*, WFAA, (July 22, 2020), https://www.wfaa.com/article/news/local/chief-rene-hall-issues-order-limiting-police-use-of-tear-gas-rubber-bullets-at-protests/287-779e61ce-a1d8-4673-aa4d-ab17747e20f3

**D.  The DPD, under DPD Chief Hall, failed to train officers or adopt policies that were necessary to avoid substantially likely deprivations of constitutional rights.**

83.      Press coverage, DPD's statements issued in response to such coverage, and DPD reports collectively show that DPD, under delegated official policymaker Chief Hall, failed to adequately train officers or adopt policies in a number of crucial areas before the protests and before Plaintiffs' arrests.

84.      In August 2020, DPD issued a final After-Action Report ("AAR") to assess the DPD's overall performance during the protests and to analyze the multiple ways that lack of training and policies created the perfect storm of chaos in DPD actions during the weekend of the protests.

85.      The AAR is defined as a "critical self-analysis intended to inspire concrete steps for organizational growth and development" that assesses "errors, miscalculations, and shortcomings" in accordance with the National Police Foundation standard for after action reporting.

86.      The AAR highlights several areas in which the DPD's actions during the protest weekend were deficient, and draws attention to several major gaps in DPD policy and training that existed at the time of Plaintiff's injuries.

87.      DPD failed to include the rules of engagement in its Operational Plans for June 1, 2020, indicating that the DPD Chief Hall failed to provide DPD officers with any guidance on the rules of engagement or necessary policies before arming those officers with multiple forms of chemical weapons munitions and sending them out to conduct mass arrests during protests.

88.      The AAR also concedes that DPD officers and supervisors clearly had not received sufficient prior training, acknowledging that "it was clear to Field Commanders that regular and reoccurring training on Mobile Field Force Tactics is needed" as "officers and supervisors . . .

appeared unsure as to the best tactics during officer/protester encounters."

89.     The AAR further details DPD's subsequent adoption of changes to DPD's use-of-force policies after the criticism it received in the wake of the protests. As previously stated, DPD Chief Hall adopted the following official policies for the DPD: (i) General Order 902.00 (restricting the use of PepperBall launchers into a crowd), (ii) General Order 908.04 (restricting the use of the 40 m.m. "Stinger" into a crowd), and (iii) General Order 901.02 (establishing an officer's duty to intervene on the behalf of an individual subjected to unlawful or unnecessary force).

90.     After significant public outrage following the visible, repeated deployment of CS gas, DPD Chief Hall also revised its policy on CS gas use, stating that in future, CS gas would not be used to direct crowd movements and would only be deployed at the direction of DPD Chief Hall or her designee.

91.     Further, by the day of Plaintiff's arrest, marches and demonstrations had been occurring throughout major cities with a history of police misconduct for at least three consecutive days. The City Defendant was thus on notice of the nature of the protests prior to June 1, 2020. In failing to train its officers to manage protests similar to those which had already begun in Atlanta, Chicago, Los Angeles, Washington, D.C., New York, Detroit, and St. Louis, DPD demonstrated careless indifference for the constitutional rights of protesters and members of the press who sought to exercise those rights during protests in Dallas.

92.     These after-the-fact changes, subsequent adoption of polices, public acknowledgment of failures to train, prior notice of the issues with the failure to adopt policies, and the actual notice of other protests throughout the country strongly indicate that at the time of Plaintiff's injuries, the DPD failed to train its officers with regard to mass arrests, officer

engagement with protesters, and the use of chemical weapons less than lethal munitions. As a result, DPD Chief Hall had actual knowledge and notice of the need to adopt such policies and training at the time of the protests in order to avoid the likely consequence that DPD Officers would act unconstitutionally.

**E.  Plaintiff's Injuries**

93.      In some respects, Plaintiff is lucky his physical injuries were not worse given the inherent danger associated with KIP. For example, a day earlier, aspiring photojournalist Vincent Doyle was shot in the face by officers while filming protests from a parking lot and required hospitalization to treat his injuries.

94.      However, Plaintiff suffered other injuries. Since his shooting and arrest on June 1, 2020, Plaintiff has begun having stress and anxiety attacks that occur seemingly at random. He has also had trouble sleeping and experiences extreme levels of anxiety when he sees a police officer or police vehicle. As a result, he started seeing a psychiatrist who has prescribed medications for him to manage stress and anxiety.

95.      He was also injured professionally. Because he was shot and detained by police for 2 ½ hours during the Bridge protest, he was unable to gather information and report on several stories he would have pursued otherwise.

96.      The City Defendant's unconstitutional policies, failure to adopt policies, and failures to train were all the direct moving force behind Plaintiff's injuries.

**F.  The Aftermath**

97.      In the immediate aftermath of Plaintiff's arrest, the U.S. Press Freedom Tracker, which tracks incidents across the country where journalists are obstructed from doing their jobs, documented Plaintiff's shooting and arrest and that of a Dallas Morning News photographer.[28] Plaintiff, acting in his journalistic capacity, has also attempted to determine what projectiles DPD

were used on him and others on the Bridge and under what authority. However, because of

Defendants, Plaintiff has been hampered in his ability to determine exactly what types of

ammunition and chemical agents John Doe Police Officers 1 and 2 shot at him, and the identities

of the John Doe Officers.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Excessive Force)**
**(As to the John Doe Defendants)**

98.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as

if fully set forth herein.

99.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and

protected by the United States Constitution and the laws of the United States, namely the Fourth

Amendment right to be free from excessive use of force in violation of clearly established constitutional

rights.

100.    Use of force violates the Fourth Amendment when an injury results (i) directly and

only from the use of force that was clearly excessive to the need, and (ii) the force used was objectively

unreasonable. See *Hale v. City of Biloxi, Mississippi*, 731 Fed. Appx. 259, 262 (5th Cir. 2018) (citing

*Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam)).

101.    It is well established that the reasonableness of an excessive force inquiry is confined

to the exact moment that resulted in the officer's use of force; and evaluated through (i) severity of the

crime at issue, (ii) whether there was an immediate threat to the safety of the officers or others, and

(iii) whether there is active resisting of arrest or attempting to evade arrest by flight. *See id.* (citing

*Brown v. Lynch*, 524 Fed.Appx. 69, 80 (5th Cir. 2013) (per curiam)); *see also Harris v. Serpas*, 745

F.3d 767, 773 (5th Cir. 2014) (citing *Rockwell v. Brown*, 664 F.3d 985, 992-93 (5th Cir.2011)).

102.    The injuries Plaintiff suffered were directly and only from the John Doe Defendants'

objectively unreasonable use of force. At the moment of the use of force, Plaintiff was not an immediate threat to the John Doe Defendants and was not actively resisting arrest. Nor was the use of force proportional to the severity of any crime at issue as, ultimately, Plaintiff was found to have conducted no criminal acts.

103.    The John Doe Defendants' conduct violated Plaintiff's clearly established constitutional right to be free from excessive force without a serious or significant threat or active resisting of arrest at the moment of force. *See Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir.2018) ("We have previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest.")

104.    As a result of the John Doe Defendants use of excessive force, Plaintiff suffered a significant injury to his body.

105.    The John Doe Defendants further acted with evil motive or intent and/or reckless and callous indifference to Plaintiff's Fourth Amendment rights, entitling Plaintiff to punitive damages.

106.    Plaintiff's requests for relief are set forth below.

### AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights (Unlawful Arrest) (As to the John Doe Defendants)

107.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

108.    The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from unreasonable search and seizure including unlawful detention, seizure, and arrest that is not supported by a warrant, probable cause, or reasonable suspicion that Plaintiff had engaged in, was engaging in, or was about to engage in any criminal conduct.

109.    On June 1, 2020, the John Doe Defendants did not establish probable cause to arrest

Plaintiff for either obstruction of a highway or riot participation.

110.    At all relevant times, Plaintiff did not commit a crime and the John Doe Defendants did not have probable cause or reasonable suspicion to believe Plaintiff had engaged in, was engaging in, or was about to engage in any criminal conduct.

111.    The John Doe Defendants' conduct violated Plaintiff's clearly established Fourth Amendment rights, of which the John Doe Defendants knew, or of which a reasonable police officer should have known, thereby making Defendants liable under 42 U.S.C. § 1983.

112.    As a direct and proximate result of the John Doe Defendant's actions, Plaintiff suffered damages, including mental anguish, professional injuries, and damage to his reputation. Plaintiff continues to experience anxiety and fear of police, knowing that at any point, without probable cause, their freedom could be taken away.

113.    The John Doe Defendants further acted with evil motive or intent and/or reckless and callous indifference to Plaintiff's Fourth Amendment rights, entitling Plaintiffs to punitive damages.

114.    Plaintiff's requests for relief are set forth below.

### AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Failure to Adopt Policies and Training)**
**(As to Defendant City of Dallas)**

115.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

116.    The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment rights afforded to individuals.

117.    Defendant City of Dallas, under delegated official policymaker DPD Chief Hall, failed to adopt policies or training regarding the appropriate use of force against protesters, use of

chemical weapons, and mass arrest procedures.

118.    DPD Chief Hall had actual knowledge and notice of the need to adopt such policies and training because of (i) the direct firing of KIPs against crowds of protestors in 2018, (ii) similar protests which had already begun in Atlanta, Chicago, Los Angeles, Washington, D.C., New York, Detroit, and St. Louis, the City, and (iii) national standards implementing such policies and training within law enforcement departments. In addition, the subsequent policies adopted by DPD Chief Hall, due to constitutional violations at the protests, further evidenced the need to adopt such policies and training prior to the protests.

119.    As a result, it was obvious to DPD Chief Hall that the likely consequences of failing to adopt such policies and training would deprive individuals of their constitutional rights, especially in regard to the use of force against protestors and mass arrests conducted without probable cause.

120.    When the likely consequence of a municipality failing to adopt a policy is the deprivation of constitutional rights; then the municipality can be deliberately indifferent to the constitutional violations by its officers. *See Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011). Further, a municipality is deliberately indifferent when it has actual or constructive notice that a failure to adopt a policy or conduct training would violate constitutional rights. *See id.* (citing *Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011)).

121.    Defendant's deliberate indifference to adopt appropriate policies or training led to the aggressive responses by DPD officers and the John Doe Defendants against Plaintiff through the use of excessive force and the firing of KIPs against his person.

122.    Defendant's deliberate indifference to adopt appropriate policies or training also led to the John Doe Defendants' unlawful arrest of Plaintiff that denied him the right to be free

from unreasonable searches and seizures.

123.    As a result, Defendant's failure to adopt necessary training and policies regarding the appropriate use of force against protesters, use of violent chemical weapons, and unlawful mass arrest procedures were the moving force behind the deprivation of Plaintiff's constitutional rights, and were a causing factor for Plaintiff's injuries.

124.    Plaintiff's requests for relief are set forth below.

### AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability – Unlawful Arrest)**
**(As to Defendant City of Dallas)**

125.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein

126.    The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from unreasonable search and seizure.

127.    Defendant's written mass arrest policies under DPD's General Orders were facially unconstitutional and encouraged deprivations of the Fourth Amendment right to be free from unreasonable search and seizure.

128.    DPD Chief Hall, as the delegated official policymaker in this area, created and promulgated Defendant's written mass arrest policies.

129.    Defendant's written mass arrest policies did not account for the significant likelihood that mass arrests would occur without proper findings of probable cause. Specifically, DPD General Order 609.00 failed to provide any checks to ensure arrests had probable cause beyond the simple approval of arrests by a Patrol Division Investigative Unit. Additionally, DPD General Order 609.00 did not provide any guidance or restrictions on arrests as it allowed officers

to conduct arrests as they saw necessary to "quell a civil unrest incident."

130.     Defendant's official mass arrest policies thus encouraged arrests without the necessary finding of probable cause; thereby causing unreasonable searches and seizures without probable cause.

131.     The official mass arrest policies also encouraged DPD officers to use arrests as a tool to shut down any civil protests without any restriction, thereby significantly increasing the likelihood of unconstitutional actions by arresting officers.

132.     Therefore, Defendant's official mass arrest policies advanced and encouraged actions that are directly in defiance of well-established law. *See Thompson v. Clark,* 141 S.Ct. 1332, 1338-1341 (2022); *see also Johnson v. Thibodaux City,* 887 F.3d 726, 735 (holding that without a crime, there was no probable cause to arrest).

133.     A municipality's policies that ignore well-settled interpretations of constitutional rights are facially unconstitutional. *See Monell v. Dep't of Social Servs*., 436 U.S. 658 (1978). Defendant's official mass arrest policies are thus facially unconstitutional, and instruct Defendant's officers to act unconstitutionally.

134.     The John Doe Defendants acted on Defendant's facially unconstitutional policies through detaining and arresting Plaintiff without probable cause.

135.     As a result, Defendant's official mass arrest policies were a moving force behind the deprivation of Plaintiff's constitutional rights.

136.     Plaintiff's requests for relief are set forth below.

**AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability – Excessive Use of Force)**
**(As to Defendant City of Dallas)**

137.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

138.    The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be from excessive use of force.

139.    Defendant's written policies towards the use of KIPs under DPD General Order 609.00 allowed for DPD officers to utilize direct contact hits against crowds of protestors without any restrictions. In addition, DPD General Order 609.00 did not place any considerations for the presence of immediate danger to any DPD officers or bystanders.

140.    Defendant's delegated official policymaker, DPD Chief Hall, created and promulgated Defendant's written policies towards the use of KIPs.

141.    It is well established that the reasonableness of an excessive force inquiry is confined to the exact moment that resulted in the officer's use of force; and evaluated through (i) severity of the crime at issue, (ii) whether there was an immediate threat to the safety of the officers or others, and (iii) whether there is active resisting of arrest or attempting to evade arrest by flight. *See Hale v. City of Biloxi, Mississippi,* 731 Fed.Appx. 259, 262 (5th Cir. 2018) (citing *Brown v. Lynch,* 524 Fed.Appx. 69, 80 (5th Cir. 2013) (per curiam)).

142.    However, Defendant's written KIP use-of-force policy did not place any requirement on DPD officers towards the use of excessive force during protest events, nor at the moment in which DPD officers may fire such weapons against crowds. As a result, Defendant's written KIP use-of-force policy instructed officers to disregard their Fourth Amendment

constitutional requirements.

143.    Defendant's written KIP use-of-force policy also did not require DPD officers to consider the reasonability of force during protest events. As a result, Defendant's KIP use-of-force policy allowed for the use of force without reasonability, in defiance of well settled law.

144.    A municipality's policies that ignores or runs counter to well-settled interpretations of the Constitution is facially unconstitutional. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Therefore, Defendant's KIP use-of-force policy was facially unconstitutional, and instructed Defendant's officers, including the John Doe Defendants, to act unconstitutionally in their use of force.

145.    The John Doe Defendants acted on Defendant's facially unconstitutional policy at the moment force was used against Plaintiff, and while Plaintiff presented no immediate threat of serious or significant harm to any person or to any of the DPD officers.

146.    The John Doe Defendants further acted on the requirements and instructions received from Defendant's written KIP use-of-force policy, and thus disregarded the necessary force to utilize during the June 1, 2020 protests.

147.    As a result, Defendant's official KIP use-of-force policy was the moving force behind the deprivation of Plaintiff's constitutional rights.

148.    Plaintiff's requests for relief are set forth below.

### AS AND FOR A SIXTH CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability - Failure to Discipline)**
**(As to Defendant City of Dallas)**

149.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

150.    The conduct alleged herein deprived Plaintiff of rights and privileges secured and

protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment rights afforded to individuals.

151.    Establishing municipal liability for failure to discipline requires (i) a supervisor failed to discipline a subordinate official, (ii) a causal link exists between the failure to discipline and the violation of constitutional rights, and (iii) the failure to discipline amounts to deliberate indifference. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Livezey v. City of Malakoff,* 657 F. App'x 274, 278 (5th Cir. 2016)).

152.    Deliberate indifference in this context requires (i) a pattern of similar actions by a final policymaker to fail to discipline constitutional violations by employees, or (ii) a single incident of a final policymaker failing to discipline extreme constitutional violations. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)).

153.    The DPD's failure to discipline any of the employees responsible for the constitutional violations during the George Floyd Protests is sufficient to establish the deliberate indifference single-incident exception. Specifically, the following indicate that the events were sufficient to establish the exception: (i) the extreme and widespread violations of Fourth Amendment during the protests, (ii) the subsequent inadequate investigations done by the DPD, (iii) the intensive news coverage of the constitutional violations and unlawful acts that occurred during the protests, and (iv) the DPD's public acknowledgement of the extreme violations.

154.    As a result of the single incident exception, Defendant, under DPD Chief Hall, was deliberately indifferent to the violations of the Fourth Amendment that would occur from their failure to discipline.

155.    The consequence of this failure to discipline employees led to an environment

where DPD Officers, including the John Doe Defendants, could act with impunity towards Plaintiff and his constitutional rights. This fact is self-evident from the wanton and malicious conduct of the John Does Defendants against Plaintiff.

156.    Therefore, Defendant's failure to discipline violations of Fourth Amendments afforded to persons allowed for DPD officers to willfully and wantonly deprive Plaintiff of his constitutional rights without any fear of reprisal, discipline, or wrongdoing.

157.    As a result, Defendant's failure to discipline was a moving force behind the injuries suffered by Plaintiff, and the deprivations of his constitutional rights.

158.    Plaintiff's requests for relief are set forth below.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Municipal Liability – First Amendment)
### (As to Defendant City of Dallas)

159.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

160.    The conduct alleged herein deprived Plaintiff of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the First Amendment right to peaceful assembly, free speech, and free press.

161.    Defendant, through delegated official policymaker DPD Chief Hall, utilized DPD General Order 609.00, 902.00, and other official policies to suppress Plaintiff's rights under the First Amendment by arresting him for lawfully protesting, intimidating him, and using violence against him. Defendant used mass arrests, excessive force, and mass intimidation to discourage protestors from exercising his First Amendment rights.

162.    As further evidence of a policy and/or practice adopted by the Defendant, the August 14, 2020 After-Action Report presented by delegated policymaker Chief Hall, wholly

approved the actions of the officers. In the "Moving Forward" section of the Report on page 45, no mention is made of any policy adjustments to ensure that citizens exercising their rights in the future are not arrested *en masse* by officers telling them that their protesting is the reason they are being arrested. In fact, the Report only expressed substantive disapproval of the message of the protest itself, complaining of the "hateful words" spoken by protestors.

163.    The policy delineated above was implemented and promulgated by DPD Chief Hall with deliberate indifference to Plaintiff's rights under the Unites States Constitution. The known and obvious consequence of the policy delineated above was that DPD officers, including the John Doe Defendants, would be using various tactics to discourage free speech and the exercise of First Amendment rights, including excessive force, mass arrests, and speech-chilling intimidation. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

164.    Consequently, the policy above was the moving force of Plaintiff's constitutional deprivations and injuries, causing the injuries described.

165.    Plaintiff's requests for relief are set forth below

## JURY DEMAND

166.    Plaintiff demands a jury trial of all claims in the Complaint on which a jury trial is available.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

A. A declaration that the practices complained of herein are unlawful and unconstitutional violations of Plaintiff's under the US Constitution and 42 U.S.C. § 1983;

B. Awarding Plaintiff his reasonable and necessary attorneys' fees and expenses which

Plaintiffs has incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1983;

C.   That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law;

D.   Awarding Plaintiff such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable;

Plaintiffs also seek injunctive relief, including, but not limited to:

A.   Training on appropriate use-of-force and de-escalation tactics for all law enforcement officials employed by Defendants; especially in regards to protest events;

B.   Adoption of use-of-force policies and standards that limit the use of force as a last resort when there is no reasonable alternative, and only when necessary to prevent imminent and serious bodily injury or death,

C.   Supervisory discipline up to and including termination for any employee or agent of the City Defendant who engages in such unlawful arrest and excessive force;

D.   Supervisory discipline up to and including termination for any employee or agent of the City Defendant involved in the incidents described herein; and

E.   Monitoring by this Court to ensure that compliance by Defendants with all injunctive relief ordered by this Court.

Plaintiff further demand that they be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: October 31, 2022     Respectfully submitted,

             */s/ David W. Henderson*
             David W. Henderson
             Texas State Bar No. 24032292
             dhenderson@equalrights.law
             Jay D. Ellwanger
             Texas State Bar No. 24036522
             jellwanger@equalrights.law
             J. Sebastian Van Coevorden
             Texas State Bar No. 24128101
             svancoevorden@equalrights.law
             **ELLWANGER LAW LLLP**
             400 S. Zang Blvd. Ste. 600
             Dallas, TX 75208
             Telephone: (469) 998-6775
             Facsimile:  (469) 998-6775

             ***COUNSEL FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on October 31, 2022 a true and correct copy of the foregoing document was served via electronic email to all counsel of record.

             */s/ David W. Henderson*
             David W. Henderson