IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEVEN M. MONACELLI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-02649-L (BT) |
| | § | |
| CITY OF DALLAS, et al., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is Defendant the City of Dallas's Motion to Dismiss Plaintiff's Second Amended Complaint, which the District Judge referred to the United States Magistrate Judge for proposed findings and a recommendation. Order Ref. 1 (ECF No. 30). After careful consideration of the Motion, Response, Reply, pleadings, record, and applicable law, the Magistrate Judge recommends that the District Court GRANT the City's Motion (ECF No. 28) and DISMISS Plaintiff's claims with prejudice.

**Background**

Plaintiff Steven Monacelli filed this civil action under 42 U.S.C. § 1983 seeking to hold the City of Dallas and several Dallas Police Department (DPD) officers liable for injuries Monacelli allegedly suffered while working as a journalist covering a protest on June 1, 2020. *See* Sec. Am. Compl. (ECF No. 25). In his live pleading, which is the Second Amended Complaint, Monacelli claims the City and

the DPD officer Defendants violated his rights under the First and Fourth Amendments to the United States Constitution when the police officers (1) used excessive force in firing a kinetic impact projectile (KIP) directly at him; and (2) unlawfully arrested and detained him, thereby preventing him from covering the protest as a journalist. *See id.* Succinctly stated, Monacelli alleges that, on May 31 and June 1, 2020, he was working as a freelance journalist on assignment for the Dallas Voice covering one of several protests that had erupted in major cities across the nation—protests "meant to shine a spotlight on abuses of power by police departments . . . and racial inequality." *Id.* ¶ 2; *see also id.* ¶¶ 35-37. Early in the morning on June 1, a large group of protesters marched onto the Margaret Hunt Hill Bridge in Dallas; and Monacelli moved with them—at the front of the group— filming the protest with his cell phone. *Id.* ¶¶ 2, 38-40. DPD officers fired KIPs at the group, and at least two KIPs hit Monacelli and caused injuries to his leg and back. *Id.* ¶¶ 3, 45-48. Police officers ignored Monacelli's requests for aid and, despite Monacelli offering proof of his press credentials, the officers arrested him and held him in custody, without a warrant and without probable cause, preventing him from further covering the protests. *Id.* ¶¶ 3, 50-55, 59-61.

In an earlier version of his complaint, Monacelli pointed to one alleged policy or custom of the City that he claimed caused the violations of his constitutional rights and that he alleged forms the basis of the City's liability under § 1983. *See* Mem. Op. & Order 9 (ECF No. 23). He also sought to establish municipal liability under a failure-to-train theory based on the City's alleged failure

to institute any training with regard to the risks of significant injury from less-than-lethal firearms. *Id.* However, the District Court granted the City's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), because the earlier Complaint failed to adequately allege facts to support the elements required to state a claim for municipal liability under § 1983. *Id.* at 11-21. Specifically, the Court determined that Monacelli—for his policy-based claim for municipal liability— failed to plead sufficient facts for it to reasonably infer that (1) an official policy; (2) promulgated by the City policymaker; (3) was the moving force behind the violation of a constitutional right. *Id.* at 11-19. The Court specifically rejected Monacelli's argument that it could reasonably infer that an unconstitutional policy or widespread custom—of City employees using non-lethal force against peaceful protestors and journalists as a means of intimidation and control—existed based on "[o]ne incident of KIP deployment at the Botham Jean protest in 2018, followed by a separate instance the night of May 31, 2020[.]" *Id.* at 14. The Court also concluded that the final policymaker for the City with respect to the challenged policies or customs was not former DPD Chief Reneé Hall, as Monacelli alleged; rather, as a matter of law, the Dallas City Council was the final policymaker. *Id.* at 18.

Regarding Monacelli's failure-to-train theory for municipal liability under § 1983, the Court determined that Monacelli failed to plead sufficient facts for it to reasonably infer that the City was deliberately indifferent in adopting its allegedly inadequate training policy. *Id.* at 19-21. The Court held that Monacelli's

3

"conclusory allegations and boilerplate recitations" that the City's training policies or procedures were inadequate and that the need for more or different training was obvious were insufficient to state a plausible claim for failure to train. *Id.* at 21. However, the Court also allowed Monacelli an opportunity to replead and cure the deficiencies outlined by the Court. *Id.* at 22.

Accordingly, Monacelli filed his Second Amended Complaint again seeking damages for the injuries he allegedly sustained on June 1, 2020. *See generally* Sec. Am. Compl. (ECF No. 25). This time, Monacelli asserts claims against the City for (1) "Failure to Adopt Policies and Training," *id.* ¶¶ 115-24; (2) "Municipal Liability – Unlawful Arrest," *id.* ¶¶ 125-36; (3) "Municipal Liability – Excessive Use of Force," id. ¶¶ 137-48; (4) "Municipal Liability – Failure to Discipline," *id.* ¶¶ 149-58; (5) "Municipal Liability – First Amendment," *id.* ¶¶ 159-65. With respect to these claims, Monacelli alleges the Chief of Police is the City's delegated official final policymaker for DPD policies, *id.* ¶¶ 20-22, and former DPD Chief Reneé Hall promulgated General Orders regarding mass arrests (General Order 609.00) and use of less-than-lethal force (General Order 902.00) that caused the DPD officers to engage in unconstitutional practices in response to the June 2020 protests. *Id.* ¶¶ 65-66, 71-78, 127-135, 139-147. He further alleges that the City and Chief Hall were on notice that a mass-arrest event involving use of force was likely to occur on June 1, 2020, and Chief Hall failed to adopt policies or provide training that were necessary to avoid the likely deprivation of constitutional rights. *Id.* ¶¶ 83, 91-92, 116-123. He also alleges that the City and Chief Hall failed to discipline any

DPD officers for their unconstitutional acts during the June 2020 protests, thus ratifying the constitutional violations that occurred during the protests and establishing the City's deliberate indifference towards the DPD officers' unlawful conduct. *Id.* ¶¶ 83-90; 153-158.

The City moves to dismiss with prejudice all of Monacelli's claims. Mot. Dismiss (ECF No. 28). The City argues that Monacelli failed to cure the deficiencies outlined in the Court's earlier Memorandum Opinion and Order, and therefore, the Second Amended Complaint still does not plead sufficient facts to state a claim for municipal liability. *See id.* at 1 ("Plaintiff's prior Complaint, which this Court dismissed for failure to state a claim, largely mirrors this one."). In particular, the City argues Monacelli's new Complaint "(1) doubles down on [his] prior attempts to claim the then-DPD Chief was the City's policymaker; and (2) claims certain police regulations ('General Orders') are deficient." *Id.* at 9. Monacelli responds that the Court should reject the City's arguments and find that he has alleged sufficient facts to demonstrate that it is plausible that the City's delegated policymaker adopted and promulgated policies for the DPD that were the moving force behind the deprivations of Plaintiff's constitutional rights. Resp. 2 (ECF No. 32). The City's Motion is fully briefed and argued and ripe for determination.

## Legal Standards

## Rule 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the light most

favorable to the plaintiff." *In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). To survive a Rule 12(b)(6) motion, a plaintiff's complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). This pleading standard does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the plaintiff is plausibly entitled to relief. *Id.* at 678 (citing *Twombly*, 550 U.S. at 557).

### Municipal Liability

While § 1983 claims may be brought against municipalities "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," municipalities cannot be held liable solely for employing a tortfeasor; that is, they "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citations omitted) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*."). This is because "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (Thomas, J.) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). And "[t]hey are not vicariously liable under § 1983 for their employees' actions." *Id.* (citations omitted); *see also Pembaur*, 475 U.S. at 479 ("Congress . . . doubt[ed] its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*." (emphasis in original) (citation omitted)). Requiring municipal-liability plaintiffs to identify an allegedly unconstitutional municipal policy or custom "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cty. Comm'rs*, 520 U.S. at 403-04 (citing *Monell*, 436 U.S. at 694). "To prevent municipal liability . . . from collapsing into

*respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* at 410. Accordingly, "[a]s is generally the case in § 1983 cases, it is far more difficult for [a] plaintiff to establish municipal liability . . . than to establish individual liability." *Ayers v. City of Holly Springs*, 2006 WL 2943295, at *4 (N.D. Miss. Oct. 13, 2006); *see also Jackson ex rel. Martin v. Town of Tutwiler*, 2018 WL 6033596, at *3 (N.D. Miss. Nov. 16, 2018) ("[T]his court acknowledges that federal law does, in fact, make it quite difficult for plaintiffs to recover against municipalities in § 1983 cases."). Though the Court does not require "proof" of any element at the motion-to-dismiss stage, a "plaintiff[ ] must allege facts that support the elements of the cause of action in order to make out a valid claim." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (per curiam) (citation and quotation marks omitted); *see also Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) ("However, 'the complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.'" (quoting Charles Alan Wright & Arthur R. Miller, 5 *Federal Practice and Procedure* § 1216, at 156-59 (2d ed.))).

Thus, to state a claim for municipal liability under § 1983, "a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell,* 436 U.S. at 691). "A plaintiff must identify: '(1)

an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom.'" *Id.* at 541-42. (quoting *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002)). "[I]solated unconstitutional actions by municipal employees will almost never trigger [municipal] liability." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (citing *Bennett v. City of Slidell,* 728 F.2d 762, 768 n.3 (5th Cir. 1984); *McKee v. City of Rockwall,* 877 F.2d 409, 415 (5th Cir. 1989)).

With respect to the first element, a plaintiff sufficiently alleges an official policy exists by pleading facts that demonstrate:

> (1) a policy statement, ordinance, regulation, or decision . . . [was] officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy.

*Burge v. Saint Tammany Par.*, 336 F.3d 363, 369 (5th Cir. 2003) (quoting *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir. 1984) (per curiam)); *see also Bd. of Cty. Comm'rs,* 520 U.S. at 404 ("Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (citations omitted)).

Concerning the second element, requiring there be a policymaker with actual or constructive knowledge of the policy, that policymaker must have "the

responsibility for making law or setting policy in any given area of a local government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988); *accord Valle*, 613 F.3d at 542. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481. In 2016, the Fifth Circuit in *Groden* revisited the question in a § 1983 action of "just who is the policymaker of the city of Dallas." *Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016). The court answered the question by "consulting [its] binding precedent," and stated that, "under Texas law, the final policymaker of the city of Dallas is the Dallas city council." *Id.* (citing *Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008)).

Last, regarding the third element that the policy alleged be the "moving force" behind the constitutional violation, a plaintiff must establish that "the municipal action was taken with the requisite degree of culpability and . . . demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs*, 520 U.S. at 404.

### Analysis

A. <u>Monacelli fails to state a § 1983 claim for municipal liability against the City because he fails to allege facts sufficient to plead that the Chief of Police is the City's official policymaker for DPD policies.</u>

As in his earlier complaint, Monacelli again alleges that the Chief of Police is the City's official policymaker for DPD policies, Sec. Am. Compl. ¶¶ 20-22 (ECF No. 25), and that former Chief Hall promulgated at least two General Orders that caused the DPD officers to engage in unconstitutional practices in response to the

June 2020 protests. *Id.* ¶¶ 65-66, 71-78, 125-136. And, as before, the City moves to dismiss Monacelli's municipal liability claims on the ground that the Chief of Police is not the City's final policymaker, as a matter of law. Mot. Dismiss 14-19 (ECF No. 28).

As the District Court explained in its Memorandum Opinion and Order granting the City's Motion to Dismiss Monacelli's earlier complaint:

> A policymaker is one who takes the place of the governing body in a designated area of city administration; governs not only conduct but decides the goals for a particular city function and devises the means of achieving those goals; and is not supervised except as to the totality of his or her performance. Policymaking authority requires more than a showing of mere discretion or decision-making authority on the part of the official. If the governing body chooses to delegate policymaking authority to a city official, it does so in either of two ways. It may delegate policymaking power by an express statement, job description, or other formal action; or it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role. In essence, the governing body must expressly or impliedly acknowledge that the agent acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent. Whether an official has been delegated final policymaking authority is a question of law for the judge, not a question of fact for the jury.

Mem. Op. & Order 16-17 (ECF No. 23) (cleaned up). And the Court concluded, "Chief Hall is not a final policymaker for the City with respect to the official policies or customs alleged in Plaintiff's § 1983 claims;" rather, the City Council is "the City's actual policymaker." *Id.* 18. This conclusion is consistent with that of several other courts in the district addressing cases that have arisen from the June 1 protest on the Margaret Hunt Hill Bridge. Indeed, no court has concluded that any

plaintiff has sufficiently alleged that Chief Hall was the designated policymaker for the City of Dallas with regard to police action in response to the protests. *See, e.g.*, *Dobbins v. City of Dallas*, 2021 WL 4395817 (N.D. Tex. June 24, 2021), report and recommendation adopted, 2021 WL 3781927 (N.D. Tex. Aug. 25, 2021), appeal dismissed, 2021 WL 7829760 (5th Cir. Dec. 16, 2021); *see also Rusanowsky v. City of Dallas*, 2023 WL 2728722 (N.D. Tex. Mar. 30, 2023) (noting that the parties did not dispute that the City Council is the final policymaker for the DPD).

Notwithstanding this precedent, Monacelli advances several theories in support of his allegation that the City delegated policymaking authority to Chief Hall and is thus liable for the alleged violations of his constitutional rights. The Court addresses these theories below.

### i.    *Express Delegation*

Monacelli alleges that—through city ordinances—the City expressly delegated final policymaking authority to DPD Chiefs, including Chief Hall. *See* Sec. Am. Compl. ¶¶ 17-20 (ECF No. 25). Monacelli cites chapter XII, § 2(1) of the City's Charter as the source of Chief Hall's policymaking authority. *Id.* ¶ 17. Specifically, he alleges that the City's Charter "delegates that the DPD Chief 'shall have immediate direction and control of the [DPD] . . . and shall promulgate all orders, rules, and regulations for government of the [DPD].'" *Id.* (ellipses in original). But Monacelli's selective quotation of the City Charter is misleading.

In full, chapter XII, § 2(1) states:

> The chief of police shall: have immediate direction and control of the police department, ***subject to the supervision of the city manager, and also subject to such rules, regulations, and orders as the city manager may prescribe, not inconsistent with the ordinances of the city,*** and shall promulgate all orders, rules, and regulations for government of the police force.

Dallas, Tex., Charter ch. XII, § 2(1) (emphasis added). Thus, the City Charter expressly provides that the Chief's control of the department is "subject to" the city manager's supervision and such rules as the city manager prescribes. *See id.* Contrary to Monacelli's argument, nothing in this provision reads as an express delegation of final policymaking authority. And courts have repeatedly rejected arguments identical to Monacelli's claims here. *See Pinedo v. City of Dallas*, 2015 WL 221085, at *5 (N.D. Tex. Jan. 15, 2015) ("[B]ecause the Chief of Police's authority is subject to supervision by the City Manager, this provision indicates that the Chief of Police does *not* act in lieu of the governing body, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent."); *Trotter v. City of Dallas*, 2020 WL 5260546, at * 7 (N.D. Tex. Aug. 14, 2020) (Rutherford, J.), report and recommendation adopted, 2020 WL 5250548 (N.D. Tex. Sept. 2, 2020) (Lindsay, J.) ("Rather, this section of the City's charter indicates the chief of police is subject to the city manager's supervision and does not have final authority to establish municipal policy with respect to police procedures." (citations omitted)); *Mosser v. Haney,* 2005 WL 1421440, at *4 (N.D. Tex. June 17, 2005) (Boyle, J.) ("[T]he Chief of Police is not

the policymaker for Dallas's police department, as he remains subject to the rules and supervision of the City Manager.").

Monacelli also alleges that the "Charter expressly restricts the city manager's 'supervision' of the DPD Chief by the terms of the [City's] Code." Sec. Am. Compl. n.9 (ECF No. 25) (citing Dallas, Tex., Charter ch. XII, § 2(1) ("not inconsistent with the ordinances of the city")). And because the City's Code "expressly define[s]" the Chief as "hav[ing] the same powers as the sheriff of a county," Monacelli avers the DPD Chief is the final policymaker because, under Texas law, a sheriff is "the recognized final and ultimate policymaking authority in the area of law enforcement for a county municipality." *Id.* ¶ 19. Thus, Monacelli alleges, the Code, "as ordained by the city council, expressly delegates the DPD Chief with official policymaking authority in the area of law enforcement, and thus, expressly delegates the DPD Chief with official policymaking authority for the DPD." *Id.*

Again, Monacelli relies on a selective reading of the City Code. In full, the provision outlining the DPD Chief's powers and duties provides:

> The chief of police shall be the chief police officer of the city **under the city manager.** He shall, either in person or by deputy, attend all meetings of the city council, and wait upon the municipal court and promptly and faithfully execute all writs and processes issued out of such court. He shall have like power with the sheriff of the county to execute search warrants and other writs. He shall quell riots, disorders, disturbances of the peace and violations of every kind within the city and shall take into custody all persons thus offending, and may take good and sufficient bail for the appearance before the municipal court of any person charged with an offense which the municipal court has jurisdiction to try. It shall be his duty to arrest without warrant all violators of the laws and ordinances and all who obstruct or interfere with him in the discharge of his duties. In the

> prevention and suppression of crime and the arrest of offenders, he
> shall have the same powers as the sheriff of a county under the laws of
> the state. He shall perform such other duties and have such other
> powers as the city council may by resolution or ordinance require or
> confer or as may be prescribed by state law.

Dallas City Code, Ch. 37, Art. II, § 37-23 (Chief of Police—Powers and Duties Generally) (emphasis added). Contrary to Monacelli's assertion, this provision of the City Code only underscores that the DPD Chief is subject to the city manager's supervision. And, again, there is nothing in this provision that reads as an express delegation of final policymaking authority. Monacelli also cites no case law for his novel reading of the Dallas City Code. *See* Sec. Am. Compl. ¶¶ 17-20 (ECF No. 25). And he ignores that "[i]t has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected[.]" *Turner v. Upton Cty.*, 915 F.2d 133, 136 (5th Cir. 1990). The DPD Chief is not an elected official. Rather, the Chief is appointed by the city manager, *see* Dallas City Code, Ch. 37, Art. II, § 37-20, and the Chief remains subject to the city manager's supervision.

Monacelli focuses on a single phrase, devoid of context, from the City Code to contend that the DPD Chief has been delegated policymaking authority. Statutory interpretation, however, is not an isolated venture but rather "is a holistic endeavor" where "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme[.]" *United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (citations omitted).

And when viewed in the context of the entire section of the City's Code, the facts alleged do not allow the Court to reasonably infer that the City Council delegated policymaking authority to any DPD Chief.

The Court, therefore, concludes that neither the City's Charter nor the Code *expressly* delegates final policymaking authority to any DPD chief, including Chief Hall.

### ii.   *Implied Delegation*

Monacelli also argues the City impliedly delegated final policymaking authority to Chief Hall. First, Monacelli alleges that "the DPD Chief's policymaking authority [exists] beyond express delegation as [the City] has consistently impliedly recognized the official policymaking authority of the DPD Chief as applied to the adoption and promulgation of the DPD General Orders." Sec. Am. Compl. ¶ 32 (ECF No. 25); *see also* Sec. Am. Compl. ¶ 21 ("[T]he [City's] Code, as ordained by [Dallas city] council, expressly recognizes that the DPD Chief utilizes the DPD General Orders in order to set the policies for the DPD."); Sec. Am. Compl. ¶ 20 (The City's Code "expressly delegates the DPD Chief with the official authority to 'oversee the administration of the [DPD] in accordance with [the City's Charter].'" (citing Dallas City Code, Ch. 37, Art. III § 37–38.2)).

Second, Monacelli contends "the DPD Chief has continually been publicly recognized as the [City's] official policymaker for DPD policies as implemented in the DPD General Orders, DPD practices, and DPD training." Sec. Am. Compl. ¶ 22 (ECF No. 25). For example, according to Monacelli, in 2018, when the City Council

was presented with an audit of Chief Hall's General Order regarding off-duty hours worked by DPD officers—"rather than act with policymaking authority for the DPD, [the city council] instead maintained the delegation of policymaking authority for the DPD Chief." *Id.* ¶ 31. So, "Chief Hall acted to implement changes to DPD's General Orders, and subsequently informed [the] City council of the official policies." *Id.* To further glean this public recognition, Monacelli cites to public news reports in the Dallas Observer, Washington Post, Texas Monthly, NPR, and WFAA—all of which refer to DPD General Orders as "policies." *Id.* ¶¶ 25 n.16, 27, 28, 29 n.19.

These arguments also fail. The City Code states "[t]he chief shall promulgate general orders and standard operating procedures" and "[t]he chief has *discretion* in how and whether to implement changes recommended by the board." Dallas City Code, Ch. 37, Art. III § 37-38.2; *see* Sec. Am. Compl. 8 n.15 (ECF No. 25). The Fifth Circuit recently reiterated that "[a] municipality can be held liable only when it delegates policymaking authority, not when it delegates *decision making* authority." *Longoria ex rel. M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (citations omitted). Although a DPD Chief may issue General Orders to establish departmental procedures and specific responsibilities of DPD officers, *see* DPD General Order 202.01; Sec. Am. Compl. ¶ 21, the DPD Chief's discretion over the DPD is not an implied delegation of final *policymaking* authority. "There is a fundamental difference between decision makers and policymakers," such that "[d]iscretion to exercise a particular function does not

17

necessarily entail final policymaking authority over that function." *Martinez v. City of North Richland Hills*, 846 F. App'x 238, 246 (5th Cir. 2021) (per curiam) (quoting *Bolton*, 541 F.3d at 548–49).

Monacelli cites several cases discussing police force management and structure in municipalities other than Dallas for the proposition that the DPD Chief's issuance of General Orders is sufficient to plausibly allege the Chief is the City's policymaker. Resp. 10-14 (ECF No. 32) (citing *Zarnow v. City of Wichita Falls,* 614 F.3d 161 (5th Cir. 2010); *Hobart v. Estrada*, 582 F. App'x 348, 356 (5th Cir. 2014); *Robinson v. City of Garland,* 2016 WL 7396048, at *1 (N.D. Tex. Aug. 17, 2016); *Villegas v. City of El Paso*, 2020 WL 981878, at *1 (W.D. Tex. Feb. 28, 2020), *aff'd sub nom. Villegas v. Arbogast*, 836 F. App'x 334 (5th Cir. 2021); *Backe v. City of Galveston*, 2 F. Supp. 3d 988, 991 (S.D. Tex. 2014); *Mote v. Walthall*, 2017 WL 2651705, at *1 (E.D. Tex. June 20, 2017), *aff'd*, 902 F.3d 500 (5th Cir. 2018)). But these references to decisions about other cities' operations is inapposite to determining whether Monacelli has alleged the Dallas City Council delegated its authority to the DPD Chief. *See Harper v. City of Dallas*, 2018 WL 11408879, at *4 (N.D. Tex. Nov. 20, 2018) (distinguishing *Zarnow*). Monacelli has failed to set forth facts that plausibly allege–or from which the Court may reasonably infer–that a final policymaker for the City of Dallas approved the policy that he alleges resulted in constitutional violations.

In addition, as discussed above, the DPD Chief's decision-making and discretionary authority over the DPD is under the supervision of the city manager.

*See Mosser*, 2005 WL 1421440, at *4 (analyzing Dallas City Charter and finding "[t]he Chief of Police is not the policymaker for Dallas's police department, as he remains subject to the rules and supervision of the City Manager"). Thus, the allegation that the City Council received an audit of the DPD Chief's General Order regarding off-duty officers demonstrates that the City retains general policymaking authority over the DPD. *See Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson, 817 F.3d 163, 166-67 (5th Cir. 2016)* (reviewing authority and concluding that the United States Court of Appeals for the Fifth Circuit has "affirmed that officials are not final policymakers when a supervisory board has the authority to accept or reject their decisions"). Monacelli's allegations regarding the off-duty officer policy may support an inference that the City may delegate that authority in particular instances, but it does not support an inference that it did so with respect to the alleged policies at issue here. *See Groden*, 826 F.3d at 286 (holding the city council ratified the mayor's policy by publicly acknowledging it as an "official city policy"). Other than conclusory remarks, Monacelli fails to allege any facts that the City ratified any of the General Orders at issue in this case.

Lastly, Monacelli's reliance on several news articles referring to the DPD Chief's General Orders as "policies" of the DPD does not support a different conclusion. *See* Sec. Am. Compl. ¶¶ 23–30 (ECF No. 25). These allegations about various news agencies' characterizations of the Chief's "official policymaking authority" in other situations are irrelevant to the Court's analysis of whether Monacelli has stated a municipal-liability claim in this case.

B. <u>Monacelli's claims against the City otherwise fail under the *Monell* standard.</u>

      *i.*     *Failure-to-Train and Failure-to-Discipline*[1]

"A failure-to-train action is a type of *Monell* claim." *Hutcheson v. Dallas Cty.*, 994 F.3d 477, 482 (5th Cir. 2021). "The 'failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009)). For a failure-to-train or a failure-to-discipline claim to survive a Rule 12(b)(6) motion, a plaintiff must sufficiently plead "that (1) the city failed to train or [discipline] the officers involved; (2) there is a causal connection between the alleged failure to [discipline] or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or [discipline] constituted deliberate indifference to the plaintiff's constitutional rights." *Id.* (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018)).

---

[1] Although Monacelli pleads failure-to-adopt policies and failure-to-train as one cause of action, an unconstitutional failure-to-train is not the same as an unconstitutional failure-to-adopt policies; each is a distinct theory of municipal liability. *See Pinder v. Skero*, 2017 WL 11612501, at *8 (S.D. Tex. Sept. 6, 2017). Therefore, the Court will analyze the two separately. Further, although Monacelli asserts separate claims for failure-to-train and failure-to-discipline, "the elements required to prove a claim under either theory are the same." *Jean v. City of Dallas*, 2019 WL 7195308, at *5 n.6 (N.D. Tex. Aug. 12, 2019) (citing *E.G. v. Bond*, 2017 WL 129019, at *3 (N.D. Tex. Jan. 13, 2017)), *adopted by* 2019 WL 7187104 (N.D. Tex. Dec. 23, 2019). The Court, therefore, considers them together.

"A pattern of similar constitutional violations by untrained [or undisciplined] employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train [or discipline]." *Connick*, 563 U.S. at 62 (quoting *Bryan Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). However, "in certain extreme circumstances, a single act by a municipal employee [may] form the basis of municipal liability apart from a pattern of unconstitutional activity." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005). But "[t]he 'single incident exception' is extremely narrow," *Valle*, 613 F.3d at 549, and "is generally reserved for those cases in which the government actor was provided no training whatsoever." *Peña*, 879 F.3d at 624.

As the City points out, the allegations regarding the City's failure to train in the Second Amended Complaint remain largely unchanged from the First Amended Complaint.[2] In the Memorandum Opinion and Order granting the City's first Motion to Dismiss, the Court concluded that alleging just two prior instances of protests with similar violations of constitutional rights failed to state a plausible claim for municipal liability based on a failure-to-train. Mem. Op. & Order 19-21 (ECF No. 23). Specifically, the Court held that Plaintiff failed to allege facts from

---

[2] The Court notes Monacelli argues that in addition to the Botham Jean protest and protests the night prior, "by the day of Plaintiff's arrest, marches and demonstrations had been occurring throughout major cities with a history of police misconduct for at least three consecutive days. The [City] was thus on notice of the nature of the protests prior to June 1, 2020." Sec. Am. Compl. ¶ 91. However, acts that occur outside the city are irrelevant to whether there is a pattern of similar constitutional violations within the city to demonstrate deliberate indifference.

which it could reasonably infer a pattern of similar constitutional violations that reveals the City's failure to train was the result of deliberate indifference. *Id.*

The only new allegations Monacelli asserts to support his failure-to-train theory all center around actions taken *after* the June 1 protests. *See* Sec. Am. Compl. ¶ 84 (ECF No. 25) ("In August 2020, DPD issued a final After-Action Report ("AAR") to assess the DPD's overall performance during the protests and to analyze the multiple ways that lack of training and policies created the perfect storm of chaos in DPD actions during the weekend of the protests."); *Id.* ¶ 89 ("DPD's subsequent adoption of changes to DPD's use-of-force policies after the criticism it received in the wake of the protests."); *Id.* ("Chief Hall adopted the following official policies for the DPD: (i) General Order 902.00 (restricting the use of PepperBall launchers into a crowd), (ii) General Order 908.04 (restricting the use of the 40 m.m. 'Stinger' into a crowd), and (iii) General Order 901.02 (establishing an officer's duty to intervene on the behalf of an individual subjected to unlawful or unnecessary force)."). However, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates . . . .'" *Connick,* 563 U.S. at 63 n. 7 (2011) (citing *Canton v. Harris,* 489 U.S. 378, 395 (1989)).

As for the failure-to-discipline claim, Monacelli again alleges no new facts or allegations—and solely relies on the single-incident exception to support liability. However, the District Court previously concluded that based on the facts alleged,

Monacelli's "allegations fall woefully short of coming within the ambit of this narrow exception." Mem. Op. & Order 21 n.7 (ECF No. 23).

Therefore, the Court should grant the City's Motion to Dismiss as to Monacelli's claims for failure-to-train and failure-to-discipline because Monacelli fails to identify a pattern of similar constitutional violations. *See, e.g.*, *Peña*, 879 F.3d at 623 (upholding dismissal of pleadings where plaintiff failed to identify pattern); *Self v. City of Mansfield, Tex.*, 369 F. Supp. 3d 684, 702-03 (N.D. Tex. 2019) (dismissing plaintiff's complaint after finding, among other things, no alleged "pattern of repeated constitutional violations" or "evidence of persistent, repeated, and constant violations of constitutional rights by virtue of this alleged failure to train"); *Harvey v. Montgomery Cty., Tex.*, 881 F. Supp. 2d 785, 798 (S.D. Tex. 2012) (dismissing First Amendment claims for failure to allege a pattern of similar constitutional violations).

In addition, Monacelli's failure-to-train and failure-to-discipline claims fail because he solely relies on the knowledge and inaction of Chief Hall—whom is not the final policymaker—and "fails to sufficiently allege that the City's training policies or procedures were inadequate, let alone facts that could state a claim that the need for more or different training was obvious." *See* Mem. Op. & Order 21 (ECF No. 23). Thus, the Court should grant the City's Motion to Dismiss for these deficiencies as well.

*ii.    Failure-to-Enact Policies*

"Supervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury." *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022). Liability only arises when the officials act, or fail to act, with "deliberate indifference." *See Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). To establish a failure-to-enact policy theory, plaintiffs must allege the official had "actual or constructive notice" that their failure to adopt policies would result in constitutional violations. *See generally id.* Actual or constructive knowledge "typically requires showing notice of 'a pattern of similar constitutional violations.'" *Crittindon*, 37 F.4th at 186 (quoting *Porter*, 659 F.3d at 447).

Under his failure-to-enact policies claim, Monacelli again relies on his argument that Chief Hall is the delegated policymaker for the City. Sec. Am. Compl. ¶ 117 (ECF No. 25) ("[The City], under delegated official policymaker DPD Chief Hall, failed to adopt policies or training regarding the appropriate use of force against protesters, use of chemical weapons, and mass arrest procedures."). As the Court previously noted, these allegations are insufficient to plausibly allege that Chief Hall is the final policymaker for the City—therefore, her actual or constructive knowledge cannot be imputed onto the City to establish municipal liability. For this reason alone, the claim should be dismissed.

Additionally, even if the allegations did support an inference that Chief Hall was the final policymaker, Monacelli's failure-to-enact policies claim is deficient

for the same reasons outlined under the failure-to-train cause of action. Monacelli fails to establish a pattern of similar constitutional violations to plausibly allege deliberate indifference. And, other than conclusory allegations and boilerplate language, Monacelli fails to allege the City's failure to enact policies "causally result[ed] in a constitutional injury."

Therefore, the City's Motion to Dismiss as to Monacelli's claim for failure to enact policies should be granted.

   iii.   *Municipal Liability for Unlawful Arrest, Excessive Force, and First Amendment Violations*

Because Monacelli's last three causes of action rely on the same two allegedly unconstitutional policies—General Orders 609.00 and 902.00—the Court discusses them together. As previously stated, to establish municipal liability Monacelli must identify: (1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.

First, the Court notes that all three causes of action are deficient as to the second element because Monacelli again alleges the delegated policymaker for the City is Chief Hall. *See, e.g.*, Sec. Am. Compl. ¶ 128 (ECF No. 25) ("Chief Hall, as the delegated official policymaker in this area, created and promulgated [the City's] policies."). As discussed above, Monacelli failed to sufficiently allege that Chief Hall was expressly or impliedly delegated final policymaking authority; therefore, Chief Hall's General Orders are not automatically the City's policies absent express

ratification by the City's policymaker—the City Council. Monacelli, however, does not allege that the City ratified either of the General Orders. Therefore, for this reason alone, all three causes of action are deficient. *See Longoria ex rel. M.L.*, 942 F.3d at 272 ("Without additional allegations that demonstrate Sanchez possessed delegated policymaking authority, plaintiffs fail to state a claim for municipal liability. Thus, we affirm the district court's dismissal of this claim."); *Trotter*, 2020 WL 5260546 at * 7 ("[Plaintiff's] allegations are not deficient because he fails to identify a policymaker, but because he affirmatively identifies an individual, the police chief, who is not the City of Dallas's policymaker as a matter of law, absent special delegation.").

Alternatively, Monacelli's claims are deficient with respect to the first and last elements. As to the first element—identifying a policy or custom—Monacelli only relies on *Chief Hall's* General Orders. Thus, he fails to identify a policy enacted by the *City*. Because he fails to adequately allege these General Orders are official policies of the City, the Court declines to consider whether they are unconstitutional. Further, because Monacelli failed to sufficiently allege a pattern existed to provide the City with constructive or actual knowledge that the alleged constitutional violations would occur—Monacelli's claims also fail as to the first element. As to the final element—moving force—Monacelli's claims fail because his allegations in support of "moving force" consist of mere legal conclusions, which do not satisfy the pleading requirements discussed in *Iqbal* and *Twombly*.

Therefore, for the reasons stated, the Court should grant the City's Motion to Dismiss as to Monacelli's claims for municipal liability.

### Dismissal With Prejudice

Finally, the City asks the Court to dismiss Monacelli's claims with prejudice. *See* Mot. Dismiss 21 (ECF No. 28). Ordinarily, the Court should afford a plaintiff the opportunity to amend his complaint in response to a recommended dismissal or when the action is to be dismissed pursuant to a court order. *See Coleman v. Bank of New York Mellon*, 969 F. Supp. 2d 736, 755 (N.D. Tex. 2013). "Courts, nonetheless, may appropriately dismiss an action with prejudice without giving an opportunity to amend when it finds that the plaintiff has alleged his or her best case." *Xiumin Li v Genentech, Inc.*, 2017 WL 6886720, at *13 (N.D. Tex. Dec. 20, 2017) (citing *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999)). Monacelli has already had ample opportunity to amend his claims. The District Court previously issued a detailed Memorandum Opinion and Order outlining the deficiencies in the First Amended Complaint, *see generally* Mem. Op. & Order (ECF No. 23), and gave Monacelli the opportunity to cure these deficiencies by filing a second amended complaint. Indeed, the District Court specifically advised Monacelli that "as a matter of law . . . former Chief Hall is not a final policymaker for the City with respect to the official policies or customs alleged in [Monacelli's] § 1983 claims," that the City's actual policymaker is the City Council, and that Monacelli had failed to allege sufficient facts to state a § 1983 claim for municipal liability. *Id.* at 18. But despite the Court's admonishment, Monacelli's Second Amended Complaint fails

to cure the identified deficiencies. There is no reason to find that Monacelli has not pleaded his best case. Therefore, Monacelli's claims should be dismissed with prejudice.

## Recommendation

For the reasons stated, the Court should GRANT the City's Motion to Dismiss Monacelli's Second Amended Complaint (ECF No. 28) and dismiss Monacelli's claims against the City with prejudice.

**SO RECOMMENDED.**

September 1, 2023.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).